518 A.2d 1238

Ida **BALL**

v.

**ROLLING HILL HOSPITAL, Israel Finestone, M.D., E. Di-Stefano, R.N., William Carlson and Kenneth Algazy, M.D.**

**Appeal of ROLLING HILL HOSPITAL and
Israel Finestone, M.D.**

**Ida BALL, Appellant,**

v.

**ROLLING HILL HOSPITAL, Israel Finestone, M.D. E. Di-Stefano, R.N., William Carlson and Kenneth
Algazy, M.D., Appellees.**

Superior Court of Pennsylvania.

Argued May 28, 1986.

Filed Dec. 16, 1986.

288

Sharon M. Reiss, Philadelphia, for appellants in No. 2654 and for appellees in No. 2763.

Robert C. Daniels, Philadelphia, for appellant in No. 2763 and for appellee in No. 2654.

Before WIEAND, BECK and JOHNSON, JJ.

WIEAND, Judge:

On January 25, 1982, Ida Ball, a victim of Hodgkin's disease, was undergoing chemotherapy treatment at Rolling Hill Hospital in Philadelphia when the chemotherapeutic drugs being administered to her intravenously by Dr. Israel Finestone infiltrated the muscle tissue of her right arm. She commenced a medical malpractice action against Rolling Hill Hospital and Dr. Finestone to recover for the loss which she had sustained as a result of the incident.[1] The jury which heard the evidence returned a verdict in favor of Ball and against Dr. Finestone and the hospital in the amount of $550,000.[2] Post-trial motions for judgment n.o.v., new trial, and remittitur were denied. The trial court

1. Also named as defendants were nurse Edith DiStefano, who assisted Dr. Finestone in administering the chemotherapeutic drugs to Mrs. Ball; William Carlson, a physician's assistant who had prepared Mrs. Ball's intravenous (IV) line; and Dr. Kenneth Algazy, Mrs. Ball's treating oncologist who had recommended treatment after infiltration had occurred. These parties were dismissed on a motion for non-suit at the close of the defendants' case.

2. The trial court added damages for delay, and its action has not been preserved as an issue in this appeal.

also denied Ball's motion for declaratory judgment in which she sought an award of post-judgment interest at the prime rate or, in the alternative, at the rate of ten percent. These cross-appeals by the parties followed. We affirm.

It is the contention of Rolling Hill Hospital and Dr. Finestone, in their appeal, that they are entitled to a new trial because of the following eight instances of trial error:

1. The trial court erred several times in misstating and mischaracterizing the deposition of Dr. Finestone and committed such other grievous errors that the granting of this appeal is mandated.

2. The trial court erred in permitting Dr. Edward Viner to testify in terms which clearly failed to meet the community's standard of care.

3. The trial court incorrectly refused appellees' request to charge the jury that a specialist is held to a higher degree of care than is a general practitioner.

4. The trial court erred in admitting into evidence the Rolling Hill Hospital chemotherapy protocol which was not promulgated until after the alleged injury.

5. The trial court erred in admitting into evidence photographs of plaintiff which were gruesome and highly prejudicial.

6. The trial court erred in excluding portions of Dr. David Harris' deposition addressing the issue of assumption of the risk and later in failing to instruct the jury on assumption of the risk, where the defense was at issue in the case.

7. The trial court erred in refusing to charge the jury on habit evidence.

8. The trial court erred in refusing appellees' request for a new panel of jurors.

Because issues two, three, five and seven have been adequately discussed and properly resolved in the opinion of the trial court, we find it unnecessary to discuss them further in this opinion. We are unable to review issue six because a transcript of Dr. Harris' videotaped deposition is

not a part of the original record sent to this Court.[3] We note, however, that even if the transcript had been contained in the record, the exclusion of Dr. Harris' testimony concerning the issue of assumption of risk would not have afforded the defendants a basis for relief. "[T]he plaintiff in a malpractice action does not assume the risk of negligence or other malpractice on the part of the defendant or physician or surgeon." 61 Am.Jur.2d *Physicians, Surgeons, and Other Healers*, § 304. The remaining issues raised by the defendants—numbers one, four and eight— will be discussed seriatim.

The central issue at trial was whether the procedure followed by Dr. Finestone, in administering the chemotherapeutic drugs to Mrs. Ball, was in accordance with the standard practice within the medical community for providing such treatment. According to the undisputed evidence, there were two acceptable procedures for administering chemotherapeutic drugs intravenously. One was to allow the medication to flow from a hanging bag through an intravenous (IV) tube into the patient's vein. Under this procedure, the rate at which the drug was introduced into the vein was to be regulated by a valve attached to the IV line. The other procedure was to use a hypodermic syringe to "push" the medication into the side portal of an established IV line by depressing the plunger of the syringe.

**3.** Also missing from the record is a transcript of the deposition testimony of Dr. Cornfield which had been presented in court on a daily copy basis. Defendants assert in a sub-issue to their first argument that the trial court, during its jury charge, erroneously summarized the substance of the doctor's testimony. We are unable to conduct a meaningful review of this issue because of the absence of the transcript of Dr. Cornfield's testimony. Although portions of the physician's testimony have been reproduced in Ball's brief, these portions are not a part of the record and cannot be considered by this Court in resolving the issues raised on appeal by the parties. See: *McFarlane v. Hickman*, 342 Pa.Super. 240, 244 n. 1, 492 A.2d 740, 742 n. 1 (1985); *New London Oil Co. v. Ziegler*, 336 Pa.Super. 380, 384, 485 A.2d 1131, 1133 (1984); *Auman v. Juchniewitz*, 312 Pa.Super. 98, 100, 458 A.2d 254, 255 (1983). An examination of the excerpted portions of Dr. Cornfield's testimony which were reproduced in Ball's brief discloses, in any event, that the trial court's characterization thereof in its instructions was correct.

No matter which procedure was used, however, it was standard procedure, throughout the course of each, to check continually to ensure that the IV line was "patent," i.e., that the catheter was still within the "feeder" vein. Four methods were used to test for patency: (1) opening the valve to the IV line to insure that the medication was flowing freely; (2) examining the area around the vein for discoloration; (3) lowering the IV bag below the level of the patient's arm; and (4) closing the IV line and pulling back on the plunger of the syringe. If the catheter were properly in the vein, the latter two tests would cause blood to be siphoned back into the IV line. Where there was little or no blood return in the line, according to prevailing knowledge, infiltration was probable.

Although Dr. Finestone had no independent recollection of the method which he had employed to administer chemotherapeutic drugs to Mrs. Ball on January 5, 1982, he testified at trial to his normal practice. He stated on direct examination that it was his practice, after an IV line had been set up but before administration of chemotherapeutic drugs had begun, to check the patency of the IV line by lowering the IV bag below the patient's arm. However, once he had begun to "push" the medication into the feeder vein via the hypodermic syringe, Dr. Finestone testified, he would thereafter check for patency only by pulling back on the plunger of the syringe.

During cross-examination, plaintiff's attorney attempted to demonstrate that this aspect of Dr. Finestone's testimony was inconsistent with statements which he had made in a pre-trial deposition. Thus, the following colloquy took place:

Q. Doctor, do you recall testifying at your deposition in Hawaii that you would rarely check for blood return by pulling back on the syringe?

A. I recall having read the deposition that I would test most of the time by dropping the bag, but the inference I was making was that this was testing prior to the beginning of the giving of the chemotherapeutic drug. I was

not testifying as to what I did during the administration of the chemotherapeutic drug.

Q. But did you not say, sir, that you rarely tested by pulling back on the syringe?

MR. POST: Objection.

THE COURT: Objection overruled.

THE WITNESS: I do not recall that exact wording. If I so stated in the deposition, I so stated, but it's not consistent with the procedure I followed during the administration of the drug.

BY MR. DANIEL:

Q. Sir, let me—

THE COURT: Page.

BY MR. DANIELS:

Q. Page forty-two, line fourteen.

Q. You indicated that there were three or four ways to insure that the IV was in place: number one was to open the line full and to see that it was running freely; number two, to check the site to see that there was no swelling or discoloration; number three, to lower the level of the bag below the level of the arm so there would be blood return; or four, an additional way which would be to close the line off and pull the syringe back with suction to see if there was blood returned.

For any of those four methods, can you specifically recollect that you did those to Ida Ball on that date? A. I can specifically recollect that I have done this for every case chemotherapy I've administered. I have the right to assume that I did so in this specific instance for Ida Ball.

Do you remember saying that?

A. I recognize it's in the deposition. So, I recognize that I probably said it.

Q. And then you were asked:

How often would you use that fourth alternative; that is to cut the line off and pull the syringe back to check to see if there was blood returned?

A. Rarely, since I found the other two techniques almost uniformly satisfactory to prove to me the line was in proper position.

Do you remember saying that, sir?

A. I don't remember having said that. I accept that I said it because it's in the deposition.

Q. So you rarely used that technique of pulling the syringe back to check for blood return by your own admission under oath; isn't that right, sir?

A. That's right and it's not right. The inference that I drew at the time of that questioning was that we were talking about the initial testing before chemotherapy was instituted. There is nothing there, there is no question there to ask me what I did during the administration of chemotherapy.

N.T. at 4.19–.22. The defendants argue that it was error for the trial court to permit plaintiff's counsel to refer to portions of Dr. Finestone's deposition testimony out of context in order to contradict his trial testimony. We disagree.

The scope of cross-examination is largely within the discretion of the trial judge, and his action will not be reversed on appeal in the absence of an abuse of that discretion or an error of law. *Townsend Will*, 430 Pa. 318, 323, 241 A.2d 534, 537, *cert. denied sub. nom, Cochran v. Morris*, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968); *Williams v. Philadelphia Transportation Co.*, 415 Pa. 370, 373–374, 203 A.2d 665, 668 (1964); *Kemp v. Qualls*, 326 Pa.Super. 319, 324, 473 A.2d 1369, 1371 (1984); *Gatling v. Rothman*, 267 Pa.Super. 566, 571, 407 A.2d 387, 389 (1979). It is clear from Pa.R.C.P. 4020(a)(1) that a "deposition may be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness." In fact, "[t]he deposition of a *party* ... may be used by an adverse party for *any* purpose." Pa.R.C.P. 4020(a)(2) (emphasis added). Thus, it was not error for the trial court to allow counsel for Mrs. Ball to cross-examine Dr. Finestone concerning his pre-trial deposition in order to impeach the

witness' credibility. The court's decision to allow such cross-examination is no less proper simply because, in conducting the cross-examination, counsel for Mrs. Ball referred only to selected portions of Dr. Finestone's deposition testimony. If defendants believed that the jury had been misled by counsel's selective reference to Dr. Finestone's deposition testimony, they could have brought to the attention of the jury any other portion of the deposition which they thought would clarify testimony taken out of context. Having failed to do so, the defendants will not be heard to argue that the selective reference to Dr. Finestone's deposition testimony by plaintiff's counsel had a deleterious effect. Given Dr. Finestone's capable explanation for the purported conflict between his deposition and trial testimonies, it is difficult in any event to imagine that the selective references cited by the defendants prejudiced the defense.

■ Because Dr. Finestone's deposition testimony was a proper subject for the jury's consideration in evaluating the physician's credibility, it was not error for the trial court to permit plaintiff's counsel to summarize that testimony during closing argument. This is so even though, according to the defendants, the testimony was mischaracterized by plaintiff's attorney. In light of the trial court's admonition to the jury that the content of the deposition testimony would be left to their recollection, any prejudice attending counsel's remarks was rectified. See: *Walasavage v. Marinelli*, 334 Pa.Super. 396, 409, 483 A.2d 509, 516 (1984).

It was Ball's contention at trial that Dr. Finestone not only had failed adequately to monitor the IV line for patency, but also that he had administered the drugs too rapidly. According to a medication chart which had been prepared by Mrs. Ball's attending nurse and which was admitted into evidence at trial, Mrs. Ball's medication was to have been administered to her by a procedure known as "IV push." In his pre-trial deposition, Dr. Finestone had testified that the term "push" meant to administer the drugs rapidly. After reviewing a transcript of his deposition testimony and

consulting with his attorney, however, Dr. Finestone later prepared an errata sheet in which he stated that "pushing" referred not to the speed with which the drugs were introduced into the patient's vein, but simply to the fact that the medication was administered by depressing the plunger of a hypodermic syringe. On cross-examination, he was asked to explain why he had changed his deposition testimony. Dr. Finestone replied that he had misinterpreted the meaning of the term during his deposition and that he had amended his deposition testimony when he realized that he had made a mistake.

The trial court, in its charge to the jury, referred to Dr. Finestone's changed testimony about the meaning of the term "IV push" in order to explain to the jury the inferences which it might draw from a prior inconsistent statement of a witness. The court instructed:

The inconsistent statement of a witness is something that you may consider in determining whether their testimony in court was correct or whether their previous testimony was correct, but obviously these are all the kinds of things that you consider, perhaps unconsciously every day in determining how and whom to believe. The evidence which you have heard that a witness made an earlier statement inconsistent with the testimony of this trial has been admitted to aid you in evaluating the credibility of the witness and you should use it in that connection. Evidence that the plaintiff or defendant made an earlier statement inconsistent with testimony at trial, you may consider in evaluating credibility, but you may also consider it as evidence here in trial. In this connection, you will consider I think the testimony of Dr. Finestone in deposition that he pushed the injections and in deposition he testified that pushing the injection meant rapid injection. However, in correcting that on his errata [sic], he said that push could be either fast or slow. The errata [sic] you recall is the process by which after the notes of testimony are transcribed they are sent to the witness and the witness goes over them and determines

whether any mistakes are concerned. If you believe that that was a mistake in transcription and that he changed only to correct his transcription, then you would be accepting his revised version as his deposition testimony. If you believe that he changed the transcription because he felt it was somewhat in his favor to have it come in differently, then you would accept his original testimony. Consider that and compare it to his testimony in court and make your judgment with reference to his credibility. N.T. at 7.25–.26. The defendants contend that this instruction was erroneous because it destroyed the credibility of Dr. Finestone by implying that he had lied either in his deposition testimony or during his appearance at trial. We do not agree.

There is no question that the definition of "IV push" given by Dr. Finestone at his deposition was inconsistent with the definition which he adopted on his errata sheet and which he later reiterated at trial. One inference which the jury might have drawn from the change in Dr. Finestone's testimony was, as the trial court suggested, that the physician was acting in his self interest. However, the jury was not instructed by the court that this was the only possible inference which it could draw. Indeed, the court invited the jury to consider other possible inferences and to exercise an independent judgment with regard to the physician's credibility. This was not error.

The defendants next allege that the trial court erred when it received in evidence the Rolling Hill Hospital nursing guidelines pertaining to the administration of chemotherapeutic agents. The guidelines established the procedure to be followed by nurses during the intravenous administration of the drugs and the steps to be taken in the event of infiltration. The earliest of these guidelines had become effective in April of 1983, more than a year after the date on which Mrs. Ball had sustained injury to her arm. She offered the guidelines into evidence during an in-chambers conference between the trial judge and the parties' attorneys. Ball contended that the guidelines were relevant to

show the procedures which could or should have been employed at Rolling Hill Hospital in January of 1982 and which were then in existence at other hospitals within the Philadelphia area. The trial court ruled, over objection, that the guidelines were admissible insofar as they tended to show that Rolling Hill Hospital had fallen below standard practice followed by hospitals within the medical community.

■ The traditional rule in negligence cases has been that post-injury repairs, improvements or precautions are not admissible to show a lack of due care at the time of the injury. *Gottfried v. American Can Co.*, 339 Pa.Super. 403, 409, 489 A.2d 222, 226 (1985). See: *Incollingo v. Ewing*, 444 Pa. 263, 274, 282 A.2d 206, 222–223 (1971); *Pressler v. City of Pittsburgh*, 419 Pa. 440, 443–444, 214 A.2d 616, 618 (1965); *O'Malley v. Peerless Petroleum, Inc.*, 283 Pa.Super. 272, 289, 423 A.2d 1251, 1260 (1980). In the instant case, the Rolling Hill Hospital nursing guidelines, which had been promulgated after the injury sustained by Mrs. Ball, were offered and admitted into evidence for the sole purpose of demonstrating the hospital's antecedent negligence in failing to adopt such procedures. We conclude that this was error.

However, not all errors committed by the trial court are grounds for a new trial. "To justify a reversal because of a ruling on evidence, the ruling must not only be technically erroneous, but it must also be harmful to the appellant." *Furey v. Thomas Jefferson University Hospital*, 325 Pa. Super. 212, 219, 472 A.2d 1083, 1087 (1984). See: *Anderson v. Hughes*, 417 Pa. 87, 92, 208 A.2d 789, 791 (1965); *Stern v. Vic Snyder, Inc.*, 325 Pa.Super. 423, 433–434, 473 A.2d 139, 145 (1984). Here, the defendants were not prejudiced by the admission of the hospital nursing guidelines. The guidelines were offered and admitted into evidence outside the presence of the jury, were not exhibited or referred to by Ball before the jury, and were not sent out with the jury to be considered during its deliberations. In fact, the guidelines were mentioned only twice throughout the entire

course of the trial, and each reference was made by or at the behest of defense counsel in a light favorable to the defense.[4] Under these circumstances, no prejudice accrued to the defense as a result of the admission of the guidelines.

Prior to commencement of trial, counsel for Mrs. Ball had been permitted, over objection, to ask the following question of a panel of prospective jurors during voir dire examination:

"Are there any among you or your immediate family and, again, defining it the way I did, who are employed by a company engaged in casualty or a liability insurance business or are there any of you or members of your immediate family who are stockholders in any company which are engaged in casualty or a liability insurance business?

Defense counsel moved to have the jury panel stricken, arguing that the inquiry had improperly introduced the issue of insurance coverage into the case. This motion was denied by the trial court. The defendants contend on appeal that the trial court erred, first when it allowed plaintiff's counsel to question the prospective jurors on the issue of insurance, and again when the court later refused to strike the jury panel which had been subjected to this inquiry.

"The sole purpose of voir [dire] examination[ ] is to secure a fair, competent and impartial jury." *Bohner v. Stine*, 316 Pa.Super. 426, 434, 463 A.2d 438, 442 (1983). See: *Bentivoglio v. Ralston*, 447 Pa. 24, 31, 288 A.2d 745, 749 (1972). To achieve this purpose, general questions should be permitted so that it can be determined whether any of the veniremen have a direct or even a contingent interest in the outcome of the litigation or the parties involved. *Id.; Atene v. Lawrence*, 428 Pa. 424, 428, 239 A.2d 346, 349 (1968), quoting *Clay v. Western Maryland*

---

4. The first reference occurred during defense counsel's cross-examination of Dr. Viner who testified that he had no knowledge or whether the hospital had employed such guidelines at the time of Ball's injury; the second was made during counsel's closing argument in which he emphasized the irrelevance of nursing guidelines to the issue of Dr. Finestone's liability.

*Railroad Co.*, 221 Pa. 439, 445–446, 70 A. 807, 809 (1908). The scope and extent of voir dire examination is within the sound discretion of the trial court and the trial court's rulings thereon will not be disturbed absent a clear abuse of that discretion. See: *Bohner v. Stine, supra* 316 Pa.Super. at 434, 463 A.2d at 442; *Lenkiewicz v. Lange*, 242 Pa.Super. 87, 93, 363 A.2d 1172, 1176 (1976).

■ No abuse of discretion is evident in the instant case. The question put to the jury panel by plaintiff's counsel was designed to determine whether any of the veniremen had a background in the liability insurance industry which might impair their ability to hear the evidence and decide the case impartially. The "[r]ight to such examination of a prospective juror is basic to an intelligent exercise of challenges for cause or peremptory challenges." 47 Am.Jur.2d *Jury* § 333. We conclude, therefore, that it was not an abuse of discretion for the trial court to allow plaintiff's counsel to ask prospective jurors whether they or any of their immediate relatives had ever been employed by or owned stock in a casualty insurance company. Accord: *Milwaukee Gear Co. v. Charles Benjamin, Inc.*, 466 F.2d 588 (3d Cir.1972).

A different conclusion is not compelled by the decision of the Pennsylvania Supreme Court in *Bentivoglio v. Ralston, supra* or by this Court's holding in *Bohner v. Stine, supra.* In *Bentivoglio*, the trial court had denied the plaintiff's request to ask veniremen during voir dire examination whether anyone was (1) an employee or stockholder of a casualty company, (2) a claims adjustor, or (3) engaged as an agent in the casualty insurance business. In affirming the ruling of the trial court, the Supreme Court opined that "[i]t is significant, if not dispositive, to note that the plaintiff does not assert that the ruling of the trial court resulted in any prejudice or that the jury empanelled in the case was not fair and impartial." *Bentivoglio v. Ralston, supra* 447 Pa. at 31–32, 288 A.2d at 749. Similarly, the trial court in *Bohner* had refused to allow plaintiff's counsel to inquire, inter alia, whether the prospective jurors or members of their families were claims adjustors for or stockholders in a casualty or liability insurance company. A panel of this

Court held that the trial court had not abused its discretion by denying the proposed inquiries in view of the fact that the plaintiff had been permitted to ask specifically whether any panel member was employed by an insurance company, and whether any was in the business of investigating claims. *Bohner v. Stine, supra* 316 Pa.Super. at 435, 463 A.2d at 442–443.

The decisions in *Bentivoglio* and *Bohner* do not stand for the proposition that a court abuses its discretion by allowing prospective jurors to be examined concerning their connections with the insurance industry. Rather, they demonstrate that the decision as to whether to allow such an inquiry is within the discretion of the trial court and should depend upon the unique circumstances of each case. These decisions, therefore, do not control the instant case. Our review of the record discloses no abuse of discretion by the trial court. It follows that the court also did not err when it refused to strike the jury panel which had been exposed to this inquiry.

Ida Ball argues in a cross-appeal that the trial court erred by refusing to award her post-judgment interest at the prime rate or, in the alternative, at the rate of ten percent. This argument is lacking in merit.

The Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S.A. § 8101 provides as follows:

> Except as otherwise provided by another statute, a judgment for a specific sum of money shall bear interest at the lawful rate from the date of the verdict or award, or from the date of the judgment, if the judgment is not entered upon a verdict or award.

The legal rate of interest is established by the Act of January 30, 1974, P.L. 13, No. 6, § 202, 41 Pa.S.A. § 202, as follows:

> Reference in any law or document enacted or executed heretofore or hereafter to "legal rate of interest" and reference in any document to an obligation to pay a sum of money "with interest" without specification of the applicable rate shall be construed to refer to the rate of interest of six per cent per annum.

■■■ These statutory provisions evince a clear intention on the part of the legislature to establish a post-judgment interest rate of six percent per annum for all actions at law. Only in an equitable action for restitution does a court have discretion to award interest in an amount in excess of six percent per annum. See: *Sack v. Feinman,* 489 Pa. 152, 413 A.2d 1059 (1980); *Murray Hill Estates, Inc. v. Bastin,* 442 Pa. 405, 276 A.2d 542 (1971); *Rizzo v. Haines,* 357 Pa.Super. 57, 515 A.2d 321 (1986). See also: *Peterson v. Crown Financial Corp.,* 661 F.2d 287 (3d Cir.1981); *Lexington Insurance Co. v. Abington Co.,* 621 F.Supp. 18 (E.D.Pa.1985). Because the action brought by Mrs. Ball was not for restitution, but for an award of damages for personal injury, she was entitled to post-judgment interest at the rate of six percent per annum. To award interest to Mrs. Ball at a rate exceeding the statutorily created rate of six percent would be to violate the mandate of a coordinate branch of our government. This we cannot and will not do. The reform in this area urged by Mrs. Ball is not a matter of judicial concern, but is solely within the province of the legislature. See: *Daset Mining Corp. v. Industrial Fuels Corp.,* 326 Pa.Super. 14, 39, 473 A.2d 584, 597 (1984).

Judgment affirmed.

BECK and JOHNSON, JJ. concur in the result.