665 So.2d 1337 (1995)
Bowman Stirling TIGHE, Jr., Executor of the Estate of Bowman Stirling Tighe, Sr., Deceased
v.
James L. CROSTHWAIT, M.D., and Jackson Heart Clinic, P.A.
No. 91-CA-00882-SCT.
Supreme Court of Mississippi.
October 12, 1995.
Rehearing Denied January 11, 1996.
William Liston, Liston & Lancaster, Winona; Dennis C. Sweet, III, Langston Frazer & Sweet, Jackson; John W. Chapman, Chapman & Younger, Brandon, for Appellant.
Senith C. Tipton, McCoy Wilkins Stephens & Tipton, Joseph L. McCoy, McCoy Wilkins Firm, Jackson, for Appellees.
Before PRATHER, P.J., and BANKS and SMITH, JJ.
BANKS, Justice, for the Court:
In this appeal we are presented with the question whether plaintiff's voir dire was wrongfully limited by the preclusion of questions regarding the possible prejudicial effect of public campaigns concerning the so-called medical negligence and insurance crisis. We conclude that the court erred in precluding the questions. Nevertheless, we affirm because we find the error harmless under the circumstances.

I.
Bowman Stirling Tighe, Jr., acting as the executor of his father's estate, filed a wrongful death action against Crosthwait and Jackson Heart Clinic, P.A. The complaint alleged that Crosthwait, individually, and the heart clinic, acting by and through Crosthwait, were liable for his father's death in connection with health care services rendered by Crosthwait on April 1, 1987, through May 8, 1987. Specifically, Tighe *1338 contended that instead of recommending that his father undergo surgery for coronary artery bypass surgery, Crosthwait should have treated the ailment without surgery.
Before the voir dire of the prospective jurors, the parties met in chambers where Tighe's attorneys informed the judge that they wished to question prospective jurors regarding advertisements, as well as a letter-writing campaign by U.S.F. & G., concerning a "medical malpractice crisis" and an "insurance crisis". Defendants' objection to this line of questioning was sustained.
Later, one of the Tighe's attorneys proffered his questions to the court. The following colloquy took place:
MR. SWEET: On the motion for reading the voir dire to the jury about knowledge of the publicity, which claims that there is a crisis in the insurance industry as a result of verdicts rendered in cases and whether the jurors had been subjected to any of the publicity, the first question would be if they had received any publicity that there was a crisis in the insurance industry; had any opinion been formed as a result of the publicity as to effect of suits versus health care professionals on the cost of medical care and the cost of insurance premiums as a result of the crisis, alleged crisis, in the insurance industry; if the jurors had formed any opinions in that regards, could the jurors set aside any opinion and base the verdict on the law and the fact in this case.

As to the insurance crisis, the first thing to do in voir dire would be to do a disclaimer that this case  that by these questions in this case, that there was insurance or not. I simply read the disclaimer to the jury, and that they are to infer from these question that there was not.
At that point ask whether any person here were employed in the insurance industry and then the follow-up questions on that  with whom they would be employed with, and whether they had opinions as a result of the employment which would affect them as jurors in the case, if they had, could they set aside that opinion and base their verdict on the law and the facts in the case.
Okay. Then ask question as to if the jurors believed that they received publicity there was a crisis in the insurance industry, and whether or not they believe jury awards affected the cost of medical care and/or insurance premiums; whether they, the jurors, believed that the amount a jury verdict in a specific case affects the costs of medical care and/or insurance premiums.

Then in this case, would it affect the amount the jury would have to pay; the jury verdict, if they believe that if a large verdict in this case, that it would affect the insurance premiums or the cost of medical care, and if they had formed such an opinion, that a large verdict in this case may affect, or a small verdict may affect, the insurance premiums or cost of medical care; in this specific case would they be able to set that opinion aside and base their verdict on the law and facts in this case alone.
(Emphasis Supplied).
Tighe offered several exhibits to support the claim that an inquiry into "medical malpractice crisis" and "insurance crisis" was proper. Exhibit A was a letter from the manager of U.S.F. & G. company in which the company's manager told policyholders that their liability premiums "are too high" because "juries in Mississippi have joined the rest of the country in a give-away program." The letter also urged policyholders to contact their state Representatives and ask them to vote to support legislation that "will put some reasonable, affordable limits on the Punitive Damages give-away program."
Exhibit B was an advertisement sponsored by the Mississippi Insurance Council. Its language was very similar to that of the letter written by the manager of U.S.F. & G. The ad contained a picture of an attorney with the jury in the background. It stated "These folks are raising your insurance premiums. IT'S TIME YOU PUT A STOP TO IT." (Emphasis in the original).
*1339 Exhibit C included an advertisement, on behalf of the American International Group, that appeared in Newsweek. The advertisement concerned the high impact of "excessive liability awards" on the United States' international competitiveness.
Exhibit D was an advertisement regarding Mississippi tort law. The advertisement stated that tort reform was needed in Mississippi because there were no guidelines for damages in this state. As a result, the advertisement stated that Mississippi was losing jobs to neighboring states that "have adopted sensible tort laws."
Exhibit E was a deposition taken in a different case in which the manager of U.S.F. & G. stated that the letter sent to policyholders was intended to influence them should they ever serve as jurors.
Significantly, none of the exhibits related to medical malpractice. The U.S.F. & G. letter and Mississippi Insurance Counsel ad clearly focused on punitive damages, as discussed in the insurance executive's deposition. The Newsweek article spoke to product liability and the remaining ad spoke to general tort reform as a competitive concern.
Despite the exhibits and the plaintiff's explanations, the trial court refused to allow prospective jurors to be questioned about "medical malpractice crisis" and "insurance crisis." The trial court did allow the plaintiff's attorney to ask jurors whether that had a financial interest in the outcome of the case and other questions more specifically discussed below.
After a five day jury trial, which consisted entirely of the testimony of three experts, one for plaintiff and two for defendants, on May 24, 1991, the jury returned a verdict for Crosthwait and the heart clinic and against Tighe and his sister. Following the disposition of post-trial motions a timely appeal was perfected.
The only issue raised by Tighe on appeal concerns the trial court's refusal to allow him to ask jurors questions about "medical malpractice negligence" and "insurance crisis" during voir dire.

II.
Tighe contends that the trial court abused its discretion when it sustained an objection to his request to question prospective jurors about publicity surrounding "medical negligence crisis" and "insurance crisis." He argues that the trial court's failure to allow him to conduct such an inquiry deprived him of his constitutional right to a competent, fair and impartial jury. He cites the Mississippi Constitution, 1890, Article III, § 31, Mississippi Power Company v. Stribling, 191 Miss. 832, 3 So.2d 807 (Miss. 1941); and Hudson v. Taleff, 546 So.2d 359 (Miss. 1989) to support his contention.
Mississippi Constitution Article III, Section 31 states that "The right to a jury trial is an inviolate right." This Court has interpreted that provision to mean that: "It is the duty of the court to see that a competent, fair and impartial jury is empaneled." Stribling, 3 So.2d at 810; Marshall Durbin v. Tew, 381 So.2d 152, 154 (Miss. 1980). Tighe argues that the clear message of Stribling and Marshall Durbin is that unless counsel is permitted to determine  for whatever reason  the existence of bias, prejudice and/or interest on the part of prospective jurors during the voir dire examination, the constitutional guarantee of trial by a fair and impartial jury is assumed to have been violated, and any verdict rendered by such an unconstitutionally constituted jury cannot be permitted to stand.
Moreover, Tighe argues, correctly, that in order to insure a party's right to a fair trial and impartial jury, free of bias and prejudice, Mississippi law allows a broad latitude on voir dire. Specifically, he contends that the only way that a party may intelligently exercise the right to challenge jurors peremptorily or for cause is that they be allowed to ask prospective jurors questions about their possible prejudice or interest in the case. He relies on Yazoo City v. Loggins, 145 Miss. 793, 110 So. 833 (1927); Avery v. Collins, 171 Miss. 636, 157 So. 695 (1934); Kennedy v. Little, 191 Miss. 73, 2 So.2d 163 (1941); and The Catholic Diocese of Natchez-Jackson v. Jaquith, 224 So.2d 216, (Miss. 1969) in support of his proposition.
*1340 While it is true that it is error to refuse to allow a party to question prospective jurors to determine whether they are biased, prejudiced or have any interest in the outcome of the case, counsel is not free of limits during voir dire. See The Catholic Diocese of Natchez-Jackson v. Jaquith, 224 So.2d 216 (Miss. 1969); Avery v. Collins, 171 Miss. 636, 157 So. 695, motion overruled, 171 Miss. 636, 158 So. 552 (1934). Voir dire examination is subject to reasonable limitations and this is especially evident in insurance cases. See Herrin Lambert & Co. v. Daly, 80 Miss. 340, 31 So. 790, 792 (1902).
In Kennedy v. Little, 191 Miss. 73, 2 So.2d 163, 164 (1941), however, the plaintiff's attorney asked two prospective jurors during voir dire if "they or either of them or any of their close relatives or kin people were connected in any way with any liability insurance company, any insurance company writing liability insurance." This Court referred to its decisions in

Yazoo City v. Loggins, 145 Miss. 793, 110 So. 833; Lee County Gin Company v. Middlebrooks, 161 Miss. 422, 137 So. 108 [1931]; Avery v. Collins, 171 Miss. 636, 157 So. 695, 158 So. 552, which put at rest, or should so do, the right of a litigant to propound in good faith similar questions to jurors on their voir dire examination "in order that the right to challenge jurors peremptorily, or for cause, may be intelligently exercised."
Kennedy, 2 So.2d at 164.
The appellees contend that this Court should follow the holding of Lowell v. Daly, 148 Conn. 266, 169 A.2d 888 (1961); Kujawa v. Baltimore Transit Company, 224 Md. 195, 167 A.2d 96 (1961); Johnson v. Hansen, 237 Or. 1, 389 P.2d 330 (1964); and McCroskey v. Proctor, 175 W. Va. 345, 332 S.E.2d 646 (1985) with regard to questions such as the ones offered here. We find each of these distinguishable on the law of the jurisdiction, the facts of the cases or both. Succinctly put, our law allows voir dire for the purpose of peremptory as well as cause challenges, Miss. Code Ann. § 13-5-69 (1972), unlike some of the other jurisdictions and, here, we have evidence of a specific campaign confronting plaintiffs, unlike the facts of some of these cases.
In Borkoski v. Yost, 182 Mont. 28, 594 P.2d 688 (1979), the plaintiff unsuccessfully sought permission
"to examine prospective jurors with a line of inquiry to determine whether any prospective jurors have been exposed to, have observed, or are aware of the national campaign by leading insurance companies, directed particularly at prospective jurors, to the effect that large jury verdicts are in fact paid by the general public at large and constituted `windfalls' to the recipients."
Borkoski, 594 P.2d at 690. The court held that
in appropriate cases an attorney upon voir dire may inquire of prospective jurors whether they have any business relationship with insurance companies and whether they are policyholders of an insurance company named as a defendant or of a mutual insurance company involved in the case. We further hold that, upon a proper showing of possible prejudice, an attorney may inquire whether a prospective juror has heard or read anything to indicate that jury verdicts for plaintiffs in personal injury cases result in higher insurance premiums for everyone; if so, whether the prospective juror believes such materials; and if so, whether the belief will interfere with the juror's ability to render a fair and impartial verdict."
Id. at 694. Although it was error not to allow the voir dire sought, the Borkoski Court held the error as harmless because the purpose of the advertisements was to reduce the amount of damages and not to encourage jurors to find insurers not guilty. Since the jury found the insurer not guilty, the jury never reached the issue of damages, and thus, the issue of damages was eradicated. See also Graham v. Waite, 23 A.D.2d 628, 257 N.Y.S.2d 629 (1965) ("the matter of dissemination through various news media of the impact of monetary awards for negligence upon automobile liability insurance rates may be a proper subject for exploration upon voir dire examination of a jury panel." Id., 257 N.Y.S.2d at 630); King v. Westlake, 264 Ark. 555, 572 S.W.2d 841 (1978) (so long *1341 as counsel acts in good faith, he may, "in one form or another question prospective jurors respecting their interest in or connection with liability insurance companies." Id., 572 S.W.2d at 844. This inquiry is in line with the purpose of voir dire examination "to enable counsel to ascertain whether there is ground for a challenge of a juror for cause, or for a peremptory challenge." Id.); Barrett v. Peterson, 868 P.2d 96 (Utah 1993) (the trial court should have allowed the plaintiffs to ask prospective jurors appropriate preliminary questions designed to detect whether any of the prospective jurors were exposed to tort reform and medical negligence propaganda. After an affirmative response, the appellant would have been entitled to ask more specific questions designed to probe those jurors' attitudes regarding possible bias resulting from the tort-reform information.). See also National County Mutual Fire Insurance Co. v. Howard, 749 S.W.2d 618 (Tx.Ct.App. 1988); Babcock v. Northwest Memorial Hospital, 767 S.W.2d 705 (Tex. 1989); Sutherlin v. Fenenga, 111 N.M. 767, 810 P.2d 353 (Ct.App. 1991), cert. denied, 111 N.M. 678, 808 P.2d 963 (1991); Kozlowski v. Rush, 121 Idaho 825, 828 P.2d 854 (Idaho 1992).
We find the facts of Borkoski almost identical to the present case, and find the court's reasoning in that case, as supported by other jurisdictions, extremely persuasive and applicable in the present case. Tighe should have been allowed to ask questions during voir dire to determine if prospective jurors had been exposed to, and or affected by the media campaign on tort reform identified by plaintiffs. This line of questioning may have exposed juror biases affecting their ability to render a fair and impartial verdict.

III.
We nonetheless find the court's error harmless. As in Borkoski, the advertisements in the present case were geared towards reducing the amount of damages, and at no point was it suggested that jurors should find defendants not liable. More specifically, here, the focus of the campaign in question was upon punitive damages rather than actual damages.
It is also important to review those inquiries that plaintiff's counsel was allowed to propound. Jurors were asked whether they belonged to any tort reform group; whether they had personal feelings that there are too many lawsuits; whether they felt that medical doctors shouldn't be sued; and whether they could give large damages if they were justified by the proof. Some jurors responded positively and were voir dired further. In sum, the counsel was afforded a broad opportunity to identify persons who may have been affected by the tort reform campaign.
Because of that fact and because the focus of the specific campaign which plaintiff sought to explore was punitive damages we conclude that the error in excluding more specific questioning concerning the tort reform campaign identified was harmless. The jurors in the present case returned a verdict in favor of Crosthwait and the heart clinic, jurors never reached the issue of actual damages, let alone punitive damages. Indeed, punitive damages were not sought in this case. Consequently, the court's error was effectively eradicated.
AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
DAN M. LEE, P.J., and McRAE, J., not participating.