## Phillips v. Hanna

450

C.P. of Lackawanna County, no. 93 CV 5051.

*Anthony P. Trozzolillo,* for plaintiffs.
*James J. Wilson,* for defendant Community Medical Center.
*Rauofe Hanna M.D.,* pro se.

NEALON, *J.,* September 7, 2004—

## ORDER

Plaintiffs have filed an "Emergency motion for continuance" seeking a postponement of this medical malpractice trial as a result of statements made by President George W. Bush during a campaign rally at the Lackawanna County Stadium on September 3, 2004. By way of brief background, the adult plaintiffs instituted this malpractice case against their minor daughter's pediatrician, Raoufe Hanna M.D. and Community Medical Center (CMC), alleging a negligent failure to diagnose the minor's hip dislocation following her birth at CMC on

December 20, 1986, and prior to her discharge on December 22, 1986. Plaintiffs contend that their child's hip dislocation was not diagnosed until 1990 and assert that the failure of Dr. Hanna and CMC's nurses to detect this condition caused the minor to undergo an open reduction with femoral shortening and adductor tenotomy on March 18, 1991. (See dkt. entry no. 4.)

Since more than four years elapsed between the date of the alleged negligence in December 1986 and the commencement of this malpractice action on September 29, 1993, CMC has been defended in this case by the former Medical Professional Liability Catastrophe Loss Fund (now the Medical Care Availability and Reduction of Error (MCare) Fund) pursuant to section 605 of the Health Care Services Malpractice Act, 40 P.S. §1301.605 (repealed by the Act of March 20, 2002, P.L. 154, no. 13, §5104(a)(2), and replaced by 40 P.S. §1303.715). For reasons that are not entirely clear from the record, the Fund has declined to provide coverage or a defense for Dr. Hanna in this matter. Dr. Hanna has opted not to defend this claim or otherwise participate in this litigation, and, as a consequence, a default judgment was entered against him on February 4, 1997, as to liability only. (*Id.,* no. 21.)

It is undisputed that Dr. Hanna was an independent contractor with staff privileges at CMC and was not an actual employee of CMC at the time that he treated the minor plaintiff there between December 20, 1986, and December 22, 1986. In order to determine whether CMC could be found vicariously liable for the defaulted liability of Dr. Hanna, the parties agreed to first litigate the issue of whether Dr. Hanna was an ostensible agent

of CMC when he treated the minor plaintiff between December 20, 1986, and December 22, 1986. At the conclusion of a jury trial limited to that ostensible agency question, the jury found that Dr. Hanna was not an ostensible agent of CMC during that time period. (*Id.*, no. 61.)

Plaintiffs thereafter chose to proceed forward with their corporate liability and nursing negligence claims against CMC and a jury trial on those issues was scheduled for September 7, 2004. On the morning of September 3, 2004, President Bush spoke at a campaign rally at the Lackawanna County Stadium. According to the text of his remarks as published in the September 4, 2004 edition of *The Scranton Times/The Tribune,* President Bush discussed a variety of issues, including education, Medicare, the economy, unemployment, foreign trade, taxes, health insurance, Social Security, federal judges, "conservative values," 9/11, terrorism, the Afghanistan and Iraq wars, and national security. During his 4,201 word address, the President also referenced medical malpractice and stated:

"I want to talk about a national issue that is of concern to millions here in Pennsylvania. Too many doctors, too many really fine healers are being forced out of practice because of the high cost of junk lawsuits. You cannot be pro-doctor and pro-patient and pro-plaintiff attorney at the same time.

"You have to choose. My opponent made his choice and he put him on the ticket. I made my choice, I'm standing with the docs and patients. We want medical liability reform now.

"Let me give you a quick story about what I'm talking about. I'm telling you this is a national problem that re-

quires a national solution. Today, I met with Dr. Neal Davis from Carbondale. He told all his patients to come. And Mary Coar, one of his patients . . . I want you to hear this story because it's happening all across America.

"Last November, after 15 years of practice in Pennsylvania, Dr. Davis learned that his insurance company would no longer insure doctors in this state because of the junk lawsuits, because the law system here in terms of medicine is like a lottery. That's what it's like. And it's unfair to patients. It's unfair to doctors. It's unfair to taxpayers. He found a new policy, but it said you had to give up delivering babies as a part of the coverage. That's what's happening to OB-GYN's all across the country.

"That forced Mary, four months pregnant, to start driving 50 miles each way to see different doctors, a different doctor. When Mary's daughter arrived this summer, she was delivered this summer by a doctor Mary had never met. She said 'I started to cry when he told me he was going to have to stop delivering.' This is happening because the legal system has gone awry. We need medical liability reform now." (*Id.,* no. 72.)

At 3:24 p.m. on the last business day prior to the start of trial, the plaintiffs filed an emergency motion for a continuance alleging that "substantial prejudice . . . has and will occur to the minor plaintiff because of the visit of President George W. Bush to Lackawanna County on Friday, September 3, 2004." (*Id.,* no. 71, ¶3.) In their motion, the plaintiffs contend that they "will be unable to obtain a fair an[d] equitable trial of this case in light of President Bush's visit to Northeastern Pennsylvania, the contents of his speech, and how the contents of this speech will be disseminated across Lackawanna Coun-

ty." (*Id.,* ¶13.) Plaintiffs further submit that "[i]t would be entirely prejudicial and unfair to this minor plaintiff to require her to select a jury that has now been tarnished and tainted by President Bush's visit to Lackawanna County." (*Id.,* ¶14.)

Prior to the commencement of jury selection on September 7, 2004, counsel for plaintiffs presented oral argument in support of the plaintiffs' motion for a continuance and defense counsel submitted CMC's arguments in opposition to the continuance request. At that time, plaintiffs were allowed to develop a record delineating the plaintiffs' grounds for requesting a continuance of the trial. (Transcript of proceedings (T.P.) on 9/7/04, volume I, pp. 2-17, 32-34, 40-42 filed as dkt. entry no. 73.) We deferred any ruling on the plaintiffs' motion and directed counsel to question the prospective jurors during voir dire regarding their knowledge of President Bush's remarks and the effect that those comments may have had on them. See *e.g., Lopez-Stayer v. Pitts,* 93 P.3d 904, 908 (Wash. App. 2004) (provided that counsel did not use the word "insurance," plaintiff's counsel in a medical malpractice action could "voir dire on the topics of 'claims,' 'frivolous lawsuits,' and the medical malpractice 'crisis' generally" since "the jury panel (as part of the general public) had been inundated with publicity about the medical malpractice crisis and its effect on the health care industry, including recent comments by the President of the United States in his State of the Union Address."); *Irish v. Gimbel,* 691 A.2d 664, 675 (Me. 1997) (medical malpractice jurors were questioned during jury selection concerning their feelings on "issues such as tort reform and problems with the court sys-

tem."); *Tighe v. Crosthwait,* 665 So.2d 1337, 1341 (Miss. 1995) (trial court erred by refusing to allow medical malpractice plaintiff to conduct voir dire to determine if prospective jurors had been exposed to and affected by media campaign on "medical malpractice crisis" and "tort reform," since that line of questioning "may have exposed juror biases affecting their ability to render a fair and impartial verdict."). Specifically, counsel for the parties were instructed to question the jurors about their attitudes toward medical malpractice and tort reform in general in order to determine whether they could serve as fair and impartial jurors in this case. Additionally, since the plaintiffs established that the venire may have been exposed to the media coverage relating to President Bush's comments on medical malpractice, we also directed counsel to question the prospective jurors regarding that subject and the impact, if any, it had on their ability to decide this case based solely on the evidence and the court's legal instructions. (Dkt. entry no. 73, pp. 3-4, 34-39, 43, 45-46, 48-52.) See *Barrett v. Peterson,* 868 P.2d 96, 99-102 (Utah App. 1993) (holding that jurors should have been questioned "whether any of the prospective jurors had been exposed to tort reform and medical negligence propaganda" and stating that "[i]n light of the pervasive dissemination of tort reform information, and the corresponding potential for general exposure to such information by potential jurors, a plaintiff is entitled to know which potential jurors, if any, have been so exposed."); *Kozlowski v. Rush,* 121 Idaho 825, 833-34, 828 P.2d 854, 862-63 (1992) (concluding that "a party may inquire whether jurors have been exposed to media accounts of a medical malpractice crisis" if the plaintiffs first "demonstrate to the court that potential

jury members may have been exposed to such advertisements."); *Sutherlin v. Fenenga,* 111 N.M. 767, 776, 810 P.2d 353, 362 (N.M. Ct. App. 1991) (malpractice plaintiff may conduct a good faith voir dire inquiry into malpractice crisis issues "upon a proper showing that members of the prospective jury panel may have been exposed to media accounts concerning allegations about the effect of jury awards on insurance costs."), *cert. den.,* 111 N.M. 678, 808 P.2d 963 (N.M. 1991); *Kelman v. Motta,* 564 So.2d 147, 148-49 (Fla. App. 1990) (malpractice plaintiff questioned jurors about impending vote on ballot proposition relating to malpractice insurance crisis); *Babcock v. Northwest Memorial Hospital,* 767 S.W.2d 705, 709 (Tex. 1989) (patient should have been permitted to question venire panel about alleged "lawsuit crisis" or "liability crisis" in order to discover any "bias or prejudice resulting from the controversy over tort reform . . . ."). Compare *Fleishman v. Smith,* 26 Phila. 218, 262 (1993) (denying request to voir dire potential jurors regarding medical malpractice crisis since plaintiffs "made no showing that the jurors impaneled on voir dire may have been exposed to media coverage concerning the issues on which the plaintiffs sought to question them."), *aff'd,* 435 Pa. Super. 630, 644 A.2d 812 (1994) (memorandum), *appeal denied,* 540 Pa. 600, 655 A.2d 989 (1995). If counsel's questioning of the jurors revealed that 12 jurors and two alternate jurors could not be selected due to their fixed opinions concerning medical malpractice, tort reform or President Bush's statements, we advised counsel for the parties that plaintiffs' motion for a continuance would be granted. Conversely, if an acceptable jury could be seated following the parties'

voir dire, the plaintiffs' continuance request would be denied. (Dkt. entry no. 73, pp. 43, 48-52.)

Of the 61 jurors who were questioned during voir dire, fewer than half of them stated that they had seen, read, or heard about President Bush's remarks pertaining to malpractice lawsuits. More importantly, none of those jurors indicated that the President's comments affected their ability to fairly and impartially decide this malpractice case based solely on the evidence and the law. (T.P. 9/7/04, vol. II, pp. 2-3, 7-8, filed as dkt. entry no. 74.) Although several jurors were dismissed for cause due in part to their firm aversion to malpractice claims which admittedly affected their ability to be fair and impartial jurors, none of those jurors ascribed their fixed opinions to President Bush's statements. (*Id.,* pp. 3-7.) Hence, even after excusing certain jurors for cause and following the parties' exercise of their peremptory challenges under Pa.R.C.P. 221, the parties were able to select 12 jurors and two alternate jurors from the first 30 members of the 61-member venire. (*Id.,* p 8.)

Pursuant to Pa.R.C.P. 216(A), a litigant may secure a continuance based upon the illness of counsel or a material witness, the inability to subpoena or obtain testimony from a material witness, the attachment of counsel to appear or participate in a disciplinary proceeding involving a lawyer or judicial officer, or "[s]uch special ground as may be allowed in the discretion of the court." The trial court is vested with broad discretion in determining whether to grant a request for a continuance and that decision should not be disturbed on appeal unless an abuse of discretion is apparent. *Corrado v. Thomas Jefferson University Hospital,* 790 A.2d 1022, 1035 (Pa.

Super. 2001), *reargument denied,* (Mar. 1, 2002). Plaintiffs were granted wide latitude in questioning prospective jurors regarding President Bush's statements and their effect on the jurors. Plaintiffs did not seek to dismiss a single juror based upon the juror's exposure to President Bush's speech, and no such challenge for cause was denied by the court. (T.P. 9/7/04, pp. 2-8.) Nor did the plaintiffs demonstrate that the ongoing medical malpractice debate will subside in the near future such that a continuance of the trial may arguably make it less likely that the venire will be exposed to information relating to malpractice litigation, tort reform and the like. In light of the scope and results of the voir dire relative to medical malpractice and tort reform issues, there is no "special ground" under Pa.R.C.P. 216(A)(4) to postpone the trial of this case which has now been pending for 11 years.

And now, September 7, 2004, upon consideration of "Plaintiffs' emergency motion for continuance," the oral argument of counsel and the results of the parties' voir dire, and based upon the reasoning set forth above, it is hereby ordered and decreed that plaintiffs' emergency motion for continuance is denied.