Jared CAPOFERRI, a Minor, by and Through Richard J. and Heather F. Capoferri, as Parents and Natural Guardians and Richard J. Capoferri and Heather F. Capoferri, H/W, in Their Own Right, Appellants,

v.

CHILDREN'S HOSPITAL OF PHILADELPHIA and Dr. Michael C. Carr and Dr. Joel C. Hutcheson, Appellees.

Superior Court of Pennsylvania.

Argued Nov. 15, 2005.
Filed Jan. 31, 2006.

Robert C. Daniels, Philadelphia, for appellants.

Nicholas M. Centrella, Philadelphia, for appellees.

BEFORE: DEL SOLE, P.J., JOYCE, MUSMANNO, LALLY–GREEN, TODD, KLEIN, BENDER, BOWES and GANTMAN, JJ.

OPINION BY BENDER, J.:

¶ 1 In this medical malpractice case, Jared Capoferri and his parents, Richard J. and Heather F. Capoferri, (collectively Plaintiffs) appeal from the judgment entered on June 29, 2004, in favor of Children's Hospital of Philadelphia (CHOP), Michael C. Carr, M.D., and Joel C. Hutcheson, M.D. (collectively Defendants).[1] Plaintiffs argue that they were

---

1. At the close of all testimony, it was determined at an in-chambers conference that CHOP's liability would not be submitted to the jury. Rather, Defendants agreed that if either Dr. Carr or Dr. Hutcheson or both were found liable by the jury, then CHOP

precluded from questioning prospective jurors during *voir dire* about the media coverage of "the alleged medical malpractice crisis in and the alleged flight of physicians from Philadelphia." Plaintiffs' brief at 7. Plaintiffs also contend that, over their attorney's objections, the trial court allowed one of Defendants' witnesses to testify about her "interpretation of alleged 'color Doppler' or supposed 'real-time' ultrasound images ... even though the actual ultrasound images had been discarded and were never made available to [Plaintiffs], or introduced as evidence at trial." *Id.* at 9–10 (emphasis omitted). We reverse and remand for a new trial.

¶ 2 The trial court set forth the following recitation of the facts:

> On or about March 6, 1999, minor plaintiff Jared Capoferri, (d.o.b. 3/29/95) was being bathed by his mother. She noticed that his left testicle was "humongous," "bright red" and "swollen." She testified that when she took down his clothes, "he cried it hurt." (N.T., 11/17/03, p. 11). She asked him if he had fallen, but he wasn't able to tell her what had happened. (N.T., 11/17/03, p. 9). She called Jared's pediatrician, who advised her to take Jared to the Emergency Room at Children's Hospital of Philadelphia ("CHOP") in the morning, but to watch him through the night for vomiting, fever and nausea. (N.T., 11/17/03, p. 12). Jared did not develop any of these symptoms, but he was not able to walk because of the swelling. In the morning, Mr. and Mrs. Capoferri took Jared to CHOP, where he was examined initially and sent for an ultrasound examination, which was conducted by Dr. Stazzone. (N.T., 11/17/03, p. 17–18). Defendant Dr. Hutcheson, a Fellow in Urology, explained to the Capoferris that the testicle has little appendages which sometimes become twisted, then untwist; he was not sure if this was what had happened to Jared. He did not recommend exploratory surgery, although Mrs. Capoferri asked about such a procedure. Dr. Hutchenson did not think the situation warranted an invasive procedure. (N.T. 11/17/03, p. 23). Based on the results of their examination, and with the caveat that if Jared developed a fever or other symptoms he should be brought back immediately, Dr. Hutcheson told the Capoferris to bring Jared back for another examination in one week. (*Id.*)
>
> Mrs. Capoferri testified that Jared did not go to his pre-school classes during the next week, that the swelling and redness did not reduce, and Jared was in extreme discomfort. (N.T., 11/17/03, p. 26–27). On March 12, 1999, Jared was examined by Dr. Hutcheson and Dr. Carr. Another ultrasound was ordered, and again performed by Dr. Stazzone. (N.T., 11/17/03, p. 31). Drs. Hutcheson and Carr reported to the Capoferris that the tests showed there was plenty of blood flow to the testicle, and that the problem would probably resolve in a week or two. Again Mrs. Capoferri asked that an operation be done to explore for testicular torsion, which she had researched during the intervening week. (N.T., 11/17/03, p. 34–35). She testified that she was quite insistent, but the physicians did not give them the option to have Jared undergo an exploratory surgical procedure. (N.T., 11/17/03, p. 36). Based on the results of that test, plaintiffs were instructed to return in two months. (*Id.* ).

would be fully liable under the theory of vicarious liability. *See* N.T. Conference in chambers, 11/24/03, at 7–12.

Mrs. Capoferri testified that eventually, during the ensuing two month period, the swelling, redness and pain decreased, and Jared resumed his normal activities. Then, on or about May 14, 1999, when Mrs. Capoferri was giving Jared his bath, he "shot up out of the tub" and announced "the big one hurts." (N.T., 11/17/03, p. 40). The next day, Mrs. Capoferri took Jared to CHOP. Dr. Carr ordered an ultrasound, and upon reviewing the results, informed the Capoferris that Jared's left testicle had atrophied. Mrs. Capoferri testified that Dr. Carr apologized and said he had no explanation for what had happened. (N.T., 11/17/03, p. 43).

Mrs. Capoferri immediately called her pediatrician for the name of another pediatric urologist and was referred to Dr. Rabinovitch at St. Christopher's Hospital. The Capoferris took Jared for a consultation, and as a result, decided to have Dr. Rabinovitch perform a short outpatient procedure in order to secure Jared's remaining testicle. (N.T., 11/17/03, p. 51–53).

Trial Court Opinion (T.C.O.), 8/3/04, at 1–3.

¶ 3 On May 10, 2001, Plaintiffs filed a complaint sounding in negligence against Defendants. A jury trial commenced on November 17, 2003. Then on November 24, 2003, the jury determined that Defendants were not negligent and returned a verdict in favor of all Defendants. Plaintiffs filed a post trial motion, requesting a new trial; however, the motion was denied and Plaintiffs filed this timely appeal.

¶ 4 Plaintiffs present the following questions on appeal:

1. Whether the trial court abused its discretion and committed reversible error in denying [Plaintiffs] the opportunity to ask prospective jurors certain questions, regarding their knowledge of or perspective about the alleged medical malpractice crisis in Pennsylvania generally and the alleged flight of physicians from Philadelphia in particular, submitted as requested *voir dire* by Plaintiffs prior to jury selection?

2. Whether the trial court abused its discretion and committed reversible error in overruling requests by [Plaintiffs], at first, to preclude, and, thereafter, to strike references to alleged color Doppler studies and/or supposed real-time ultrasound images relied upon by the defense, which studies and/or images were not preserved by [Defendants] and were never made available for review by the medical experts who testified on behalf of [Plaintiffs]?

Plaintiffs' brief at 4.

¶ 5 Initially, we note our standard of review with regard to a motion for a new trial.

We will reverse a trial court's decision to deny a motion for a new trial only if the trial court abused its discretion. We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial. If the alleged mistake concerned an error of law, we will scrutinize for legal error. Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial. "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will."

*Stalsitz v. Allentown Hosp.*, 814 A.2d 766, 771 (Pa.Super.2002), *appeal denied*, 578 Pa. 717, 854 A.2d 968 (2004) (citations

omitted). With this standard in mind, we proceed to review Plaintiffs' issues.

¶ 6 Plaintiffs first argue that the court's refusal to allow the reading of selected questions to prospective jurors during *voir dire* prejudiced them in their ability to select an impartial jury. Specifically, Plaintiffs contend that the inability to direct questions to the jury pool about the publicity occurring before and at the time of trial about the "medical malpractice crisis" to determine the extent of knowledge and/or influence this information had on the jurors, who would ultimately be chosen to sit in judgment in this matter, hampered Plaintiffs in the screening process. Although Plaintiffs submitted numerous questions, requesting they be read to prospective jurors, only the following questions, among those submitted to the trial court prior to the start of *voir dire* on November 14, 2003, that the trial court rejected, are at issue here. Those questions are:

27) Have you seen or heard advertisements which criticize persons who use the judicial system as a method of recovering money for personal injuries or damages caused by another person? If so, what have you seen or heard?

28) Does anything concern you about personal injury lawsuits generally or medical malpractice cases in particular in which an injured person seeks

money damages? If so, what is your concern? Please explain.

29) Do any of you have any prejudice against a person who files a lawsuit seeking money damages for personal injuries based upon anything you or anyone in your family or household has seen or heard, or based upon any personal feelings or thoughts you may have?

30) Do any of you have any preconceived prejudice against individuals who file a lawsuit claiming injuries as a result of the medical malpractice of hospitals and/or physicians, because of recent publicity, advertising or newspaper stories that you have read or heard regarding the "so-called" medical malpractice crisis in the Philadelphia community? If so, please explain.

Requested Jury *Voir Dire* Submitted on Behalf of Plaintiffs [Amended], 11/14/03, at ¶¶ 27–30.[2]

¶ 7 In response to Plaintiffs' first issue, the trial court explained the practice it employed whereby a standard set of questions is posed "to the entire jury panel, followed by individual voir dire of each potential juror in order to follow up on their responses in the courtroom and their individual responses to the standard jury questionnaire." T.C.O. at 4–5. The trial court then noted the attachment of these standard questions to its opinion[3] and added that:

We also note that Plaintiffs' Statement of *Matters Complained of on Appeal* lists proposed questions 27–32, while Plaintiffs' brief lists questions 27–32 and 35, and at the proceeding at which Plaintiffs registered their objections on November 17, 2003, the proposed questions addressed were limited to questions 27–30 and 34–36. These differences allow for only questions 27–30 to be considered at issue by this Court.

**2.** Plaintiffs registered their formal objection to the denial by the trial court of their right to have these questions submitted to the jury just prior to the start of trial. *See* N.T. *Voir Dire* Objections, 11/17/03, at 2–3 (a proceeding held in open court out of the presence of the jury). It is evident from statements made by Plaintiffs' attorney and the court that the questions had been timely and properly submitted and had been rejected prior to the start of the jury selection process. *Id.*

**3.** The standard questions referred to by the trial court include:

[C]ounsel for both sides are free to ask questions on individual voir dire regarding the venireperson's experience with lawsuits, experience in medical-related and law-related jobs, the person's attitude toward jury verdicts for "pain and suffering" and other intangible damages, and the person's capacity for fairness. It is this court's experience that jurors' prejudices, both favorable and unfavorable to one side or the other, are more than adequately explored in this fashion, without opening the door for entire panels of jurors to be found unsuitable for service because they have heard about a particular public issue, such as the "medical malpractice crisis."

*Id.* at 5. Accordingly, the trial court found Plaintiffs' first issue without merit.

 ¶ 8 Initially, we note that in addition to the standard of review applicable to a request for a new trial as delineated above, we further recognize that:

The sole purpose of voir [dire] examination[ ] is to secure a fair, competent and impartial jury. To achieve this purpose, general questions should be permitted so that it can be determined whether any of the veniremen have a direct or even a contingent interest in the out-

come of the litigation or the parties involved. The scope and extent of voir dire examination is within the sound discretion of the trial court and the trial court's rulings thereon will not be disturbed absent a clear abuse of that discretion.

*Ball v. Rolling Hill Hosp.,* 359 Pa.Super. 286, 518 A.2d 1238, 1244–45 (1986) (citations and quotation marks omitted). Additionally, as referenced by Plaintiffs, Pa. R.C.P. 220.1, the rule of civil procedure that governs *voir dire,* provides in pertinent part that:

(a) Voir dire shall be conducted to provide the opportunity to obtain at a minimum a full description of the following information, where relevant, concerning the prospective jurors and their households:

(11) Relationship of the prospective juror or any member of the prospective juror's immediate family to the insurance industry, including employee, claims adjustor, investigator, agent, or stockholder in an insurance company;

. . .

16. Have you or anyone close to you ever sued someone, been sued, or been a witness?
17. Have you or anyone close to you been employed as a lawyer or in a law-related job?
18. Have you or anyone close to you been employed as doctor or nurse or in a medical-related job?
19. In a civil case, would you have any problem following the Court's instruction that the plaintiff has the burden of proof, but unlike a criminal case, the test is not beyond a reasonable doubt but "more likely than not"?
20. In a civil case, would you have any problem putting aside sympathy for the plaintiff and deciding the case solely on the evidence?

21. In a civil case, would you have any problem following the Court's instruction to award money for damages for things like pain and suffering, loss of life's pleasures, etc., although it is difficult to put a dollar figure on them?
22. Would you have any problem during jury deliberations in a civil case discussing the case fully but still making up your own mind?
23. Is there any reason in a civil case that you cannot follow the Court's instructions on the law?
24. Is there any reason in a civil case that you cannot otherwise be a fair juror?

Juror Information Questionnaire, at 2.

(14) Reasons the prospective juror believes he or she cannot or should not serve as a juror;

. . .

(16) Such other pertinent information as may be appropriate to the particular case to achieve a competent, fair and impartial jury.

Pa.R.C.P. 220.1(a)(11), (14) and (16).

¶ 9 Thus, the question we must address in this case is, whether in light of the pretrial publicity of the "medical malpractice crisis" in Pennsylvania and especially in the City of Philadelphia, the trial court should have allowed questioning relating thereto during *voir dire* in order to secure a fair, competent, and impartial jury. We have been unable to locate any Pennsylvania appellate court cases directly on point and neither party has cited such a case. Plaintiffs rely on decisions from other jurisdictions that address whether, in the context of medical malpractice lawsuits, questions about media coverage concerning tort reform in general and the medical malpractice crisis in particular were proper subjects for *voir dire* examination. These decisions include *Babcock v. Northwest Mem'l Hosp.*, 767 S.W.2d 705 (Tex. 1989), *Barrett v. Peterson*, 868 P.2d 96 (Utah Ct.App.1993), and *Kozlowski v. Rush*, 121 Idaho 825, 828 P.2d 854 (1992).

¶ 10 Our own research has produced a recent Lackawanna County Court of Common Pleas opinion that allowed questioning of prospective jurors during *voir dire* in a medical malpractice case "regarding their knowledge of President Bush's remarks [made during a campaign rally in the area on September 3, 2004, just before the scheduled start of trial on September 7, 2004] and the effect that those comments may have had on them." *Phillips v. Hanna*, 67 Pa. D. & C.4th 449 (Lack.Cty. 2004).[4] In its opinion, the trial court in *Phillips* supported its decision to allow the *voir dire* examination with an extensive list of cases from varied jurisdictions that includes the cases on which Plaintiffs rely.

---

**4.** The *Phillips* decision quoted the following excerpt from President Bush's statements at the rally, the text of which was published in *The Scranton Times/The Tribune* on September 4, 2004:

"I want to talk about a national issue that is of concern to millions here in Pennsylvania. Too many doctors, too many really fine healers are being forced out of practice because of the high cost of junk lawsuits. You cannot be pro-doctor and pro-patient and pro-plaintiff attorney at the same time. "You have to choose. My opponent made his choice and he put him on the ticket. I made my choice, I'm standing with the does [sic] and patients. We want medical liability reform now.

"Let me give you a quick story about what I'm talking about. I'm telling you this is a national problem that requires a national solution. Today, I met with Dr. Neal Davis from Carbondale. He told all his patients to come. And Mary Coar, one of his patients...I want you to hear this story because it's happening all across America.

"Last November, after 15 years of practice in Pennsylvania, Dr. Davis learned that his insurance company would no longer insure doctors in this state because of the junk lawsuits, because the law system here in terms of medicine is like a lottery. That's what it's like. And it's unfair to patients. It's unfair to doctors. It's unfair to taxpayers. He found a new policy, but it said you had to give up delivering babies as a part of the coverage. That's what's happening to OB–GYN's all across the country.

"That forced Mary, four months pregnant, to start driving 50 miles each way to see different doctors, a different doctor. When Mary's daughter arrived this summer, she was delivered this summer by a doctor Mary had never met. She said 'I started to cry when he told me he was going to have to stop delivering.' This is happening because the legal system has gone awry. We need medical liability reform now." *Phillips*, 67 Pa. D. & C.4th at 452–53.

The court's list was comprised of the following:

> See e.g., *Lopez–Stayer v. Pitts*, 122 Wash.App. 45, 93 P.3d 904, 908 (2004) (provided that counsel did not use the word "insurance," plaintiff's counsel in a medical malpractice action could "voir dire on the topics of 'claims,' 'frivolous lawsuits,' and the medical malpractice 'crisis' generally" since "the jury panel (as part of the general public) had been inundated with publicity about the medical malpractice crisis and its effect on the health care industry, including recent comments by the President of the United States in his State of the Union Address."); *Irish v. Gimbel*, 1997 ME 50, 691 A.2d 664, 675 (Me.1997) (medical malpractice jurors were questioned during jury selection concerning their feelings on "issues such as tort reform and problems with the court system."); *Tighe v. Crosthwait*, 665 So.2d 1337, 1341 (Miss.1995) (trial court erred by refusing to allow medical malpractice plaintiff to conduct voir dire to determine if prospective jurors had been exposed to and affected by media campaign on "medical malpractice crisis" and "tort reform," since that line of questioning "may have exposed juror biases affecting their ability to render a fair and impartial verdict."). ... *See Barrett v. Peterson*, 868 P.2d 96, 99–102 (Utah App.1993) (holding that jurors should have been questioned "whether any of the prospective jurors had been exposed to tort reform and medical negligence propaganda" and stating that "in light of the pervasive dissemination of tort reform information, and the corresponding potential for general exposure to such information by potential jurors, a plaintiff is entitled to know which potential jurors, if any, have been so exposed."); *Kozlowski v. Rush*, 121 Idaho 825, 833–34, 828 P.2d 854, 862–63 (1992) (concluding that "a party may inquire whether jurors have been exposed to media accounts of a medical malpractice crisis" if the plaintiffs first "demonstrate to the court that potential jury members may have been exposed to such advertisements."); *Sutherlin v. Fenenga*, 111 N.M. 767, 776, 810 P.2d 353, 362 (N.M.Ct.App.1991) (malpractice plaintiff may conduct a good faith voir dire inquiry into malpractice crisis issues "upon a proper showing that members of the prospective jury panel may have been exposed to media accounts concerning allegations about the effect of jury awards on insurance costs."), *cert. den.*, 111 N.M. 678, 808 P.2d 963 (N.M.1991); *Kelman v. Motta*, 564 So.2d 147, 148–49 (Fla.App.1990) (malpractice plaintiff questioned jurors about impending vote on ballot proposition relating to malpractice insurance crisis); *Babcock v. Northwest Memorial Hospital*, 767 S.W.2d 705, 709, 32 Tex. Sup.Ct. J. 294 (Tex.1989) (patient should have been permitted to question venire panel about alleged "lawsuit crisis" or "liability crisis" in order to discover any "bias or prejudice resulting from the controversy over tort reform ...."). *Compare Fleishman v. Smith*, 26 Phila. 218, 262 (1993) (denying request to voir dire potential jurors regarding medical malpractice crisis since plaintiffs "made no showing that the jurors impaneled on voir dire may have been exposed to media coverage concerning the issues on which the plaintiffs sought to question them."), *aff'd*, 435 Pa.Super. 630, 644 A.2d 812 (1994) (memorandum), *appeal denied*, 540 Pa. 600, 655 A.2d 989 (1995).

*Phillips*, 67 Pa. D. & C.4th at 454–56. Although the *Phillips* court indicates that this Court affirmed the *Fleishman* decision by memorandum, our research indicates that this Court affirmed the trial

court's decision in *Fleishman per curiam* **without** an opinion. Therefore, the affirmance has no precedential effect. *See Commonwealth v. Tilghman*, 543 Pa. 578, 673 A.2d 898, 904 (1996) (explaining that a *per curiam* affirmance becomes the law of the case, but to adopt the rationale employed by a lower court, a *per curiam* order to affirm on the basis of the opinion of that court would be required).

¶ 11 Thus, although we are not bound by the *Fleishman* decision, we find that opinion instructive. The *Fleishman* court recognized that no Pennsylvania appellate court had as yet addressed the specific *voir dire* issue involving media coverage in a medical malpractice case. Therefore, it also relied on decisions from other jurisdictions that it indicated had prohibited this type of inquiry due to the possible interjection of the subject of insurance coverage at trial. It also cited decisions from other jurisdictions that permitted the malpractice crisis types of questions during *voir dire*. In concluding that the plaintiffs' request was properly denied, the court in *Fleishman* found that there was a failure by the plaintiffs to state the specific grounds to support their post-trial request for relief, *i.e.*, they did not specify which questions the court refused to pose to prospective jurors that would have formed the basis for their claim that reversible error had been committed. The *Fleishman* court also found that the plaintiffs had failed to lay a foundation by not "showing that the jurors impaneled on voir dire may have been exposed to media coverage concerning the issues on which plaintiffs sought to question them." *Fleishman*, 26 Phila. at 262. The court also opined that:

> [T]he "problem" of media coverage of the "insurance crisis" or "lawsuit crisis" goes both ways. Special interest groups which lobby for plaintiffs' rights have access to the same media markets as do insurers' lobbyists, so that prospective jurors may well be subject to information campaigns from both points of view. If inquiry into jurors' exposure to propaganda favoring one party is permitted, then inquiry into jurors' exposure to propaganda favoring the other party must also be permitted. It should be within the trial court's discretion to limit interrogation into such matters on voir dire.

*Id.*

¶ 12 We agree that proponents on both sides of this issue have media access. We are also aware that prospective jurors may be exposed to information from a myriad of sources that espouse opinions that take extreme positions or opinions that fall anywhere in the middle of a debate. However, we cannot conclude that this is a valid reason not to allow questioning of prospective jurors when there has been a massive amount of media coverage on an issue that relates to the matter that will be heard by the chosen panel. Interestingly, Defendants do not argue that there was no such media attention to the "medical malpractice debate" at the time the instant case was tried. Rather, they contend that the standard set of questions noted by the trial court, accompanied by individual *voir dire*, should be found to be sufficient to satisfy the goal of impaneling a fair, competent, and impartial jury. We disagree.

¶ 13 To begin, we again reference Rule 220.1(a)(16), which directs that *voir dire* "shall" include the opportunity to obtain "[s]uch other pertinent information as may be appropriate to the particular case...." Pa.R.C.P. 220.1(a)(16). We also are cognizant that Rule 220.1 of the Allegheny County Court Rules contains a detailed list of questions to be directed at prospective jurors in civil cases, unless "all parties agree in advance to strike, as inappropriate for the type of case in-

volved...." Rule 220.1 of the Allegheny County Court Rules. In addition to a list of questions that are directed to the group, the local rule sets forth questions to be asked individually. For example, those that are pertinent to the issue before us provide:

> 19) Have you heard or read information or advertising on television, radio, or in the newspapers that deals with the subject of lawsuits generally?
>
> > a) As a result, do you have an opinion or belief about lawsuits in general?
> >
> > b) If so, what is that opinion or belief?
> >
> > c) Will that influence your judgment in this case that you may not be able to be fair and impartial?
>
> 20) This case involves a claim for money damages and is the type commonly called a _____ (products liability; medical malpractice; auto accident; breach of contract, etc.) lawsuit.
>
> > a) Do you have an opinion or a belief for or against this type of case or the people who file this type of case, or the persons who are sued in this type [of] case?
> >
> > b) If so, what is that opinion or belief?
> >
> > c) Will that influence your judgment in this case so that you may not be able to be fair and impartial?
>
> 21) Is there any reason why you feel you cannot serve as a fair and impartial juror in this case?

*Id.*[5] These questions asked of prospective jurors at civil trials in Allegheny County appear to be the type of general questions that the court in *Ball* proposed so that "it can be determined whether any veniremen have a direct or even a contingent interest...." *Ball,* 518 A.2d at 1245.

¶ 14 Based on the above, we conclude that, with the amount of publicity occur-ring at the time this case was ready for trial, the parties should have been allowed to question prospective jurors about their attitudes regarding medical malpractice and tort reform in · order to determine whether each individual juror could serve in a fair and impartial manner. Common sense dictates that the type of media coverage that accompanied the debate over tort reform created a climate from which the average person could conclude that he or she would be economically impacted and/or be deprived of accessible health care services. Because there was no question that there was pervasive media coverage on the issue of medical malpractice prior to trial in the instant case, we conclude that counsel for both sides should have been permitted to question the prospective jurors regarding the subject and attempt to glean whether there was any impact on any individual juror's ability to decide the case fairly and impartially. We hold, as did the Texas Supreme Court in *Babcock,* that "[t]he trial court's actions, which resulted in the denial of the [plaintiffs'] constitutional right to trial by a fair and impartial jury, was harmful ..." [and] "was an abuse of discretion...." *Babcock,* 767 S.W.2d at 709.

¶ 15 We believe that our holding today follows the dictates of our Supreme Court's decision in *Atene v. Lawrence,* 428 Pa. 424, 239 A.2d 346 (1968), a case in which the Court held that the trial court did not abuse its discretion when it refused to permit a question during *voir dire* as to whether the prospective jurors or their relatives or friends worked as claims investigators. The Supreme Court held that, although the general inquiry was appropriate, the question was too broad and should have been limited to "relatives" and not to relatives and friends. *Id.* at 350. More importantly, recognizing that there

---

**5.** Adopted December 23, 1997, effective February 9, 1998.

are times when jurors are not aware of their own disqualifications, the *Atene* court stated:

> [I]t may be remarked that the better practice is to allow a general inquiry as to the direct or even contingent interest of jurors, in the result of the litigation, or in the parties to it, when there appears to be any reasonable grounds to believe that some of them may have a possible interest in the result of the litigation, or in the parties, in order that an impartial jury may be selected, free from bias or interest.

*Id.* at 349 (quoting *Clay v. Western Md. R.R. Co.*, 221 Pa. 439, 445, 70 A. 807 (1908)).

■ ¶ 16 However, in concluding as we have, we do not necessarily endorse those questions proffered by Plaintiffs. Rather, as stated by the court in *Barrett*, "we conclude that the trial court should have asked the prospective jurors appropriate preliminary questions—either those suggested by appellant or alternative questions more to its liking—designed to detect, initially, whether any of the prospective jurors had been exposed to tort reform and medical negligence propaganda." *Barrett*, 868 P.2d at 102. "Had the trial court done so, and had any of the jurors responded positively to these initial questions, [either party] would have been entitled to have more specific questions put to the jurors designed to probe those jurors' attitudes regarding, and possible bias resulting from, the tort-reform information." *Id.* We find that this practice would be the most prudent course of action to ensure that a fair, impartial, and unprejudiced jury is selected to hear and decide the case. Because this was not done, we are compelled to reverse the judgment entered and remand for a new trial.

■ ¶ 17 Having determined that under the circumstances here a remand for a new trial is appropriate, we need not address Plaintiffs' second issue. However, because a second trial is likely, we will provide a limited explanation why we find Plaintiffs' second issue without merit. Plaintiffs contend that Defendants did not provide any reasonable explanation why the "color Doppler" and "real-time" images used by Defendants in their treatment decisions were not preserved and made available to Plaintiffs and that, therefore, the trial court should not have allowed references to these images by Defendants and their witnesses. The trial court pointed to the testimony given on cross-examination by Dr. Hutcheson, who explained that although "the radiologist [Dr. Stazzone] was able to view an ultrasound on the screen in color, ... 'they didn't have the technology at CHOP to print color film.'" T.C.O. at 5 (quoting N.T., 11/20/03, at 155). Consequently, the trial court determined that "Defendants have provided the clearest explanation possible as to why the original color ultrasound was not available for viewing by the jury. Defendants cannot be expected to provide something that did not exist at the time." *Id.* at 7.

■ ¶ 18 Our standard of review of an evidentiary ruling made by the trial court is extremely narrow.

> The admission or exclusion of evidence is a matter within the sound discretion of the trial court, which may only be reversed upon a showing of a manifest abuse of discretion. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Potochnick v. Perry*, 861 A.2d 277, 282 (Pa.Super.2004). Based upon our review, we conclude that the court's ruling, allowing references to the color images while

only black and white photographs were available for display to the jury, was not a manifest abuse of discretion. We further note that Plaintiffs failed to provide citations to authorities to support their argument with regard to this issue. *See* Pa. R.A.P. 2119(a).

¶ 19 Judgment reversed. New trial granted. Jurisdiction relinquished.

¶ 20 Judge KLEIN files a dissenting opinion in which Judge JOYCE and Judge LALLY–GREEN join.

## DISSENTING OPINION BY KLEIN, J.:

¶ 1 Whether or not it is necessary to specifically address the so-called "medical malpractice crisis" in *voir dire*, I do not believe the official record in this matter is sufficient to hold that plaintiffs were prejudiced during the *voir dire* process. Therefore, I respectfully dissent.

¶ 2 Even if the "medical malpractice crisis" should be addressed in *voir dire*, the actual *voir dire* process was not transcribed. All that we have is a comment made *after the jury was selected* indicating that the judge might have refused to ask certain specific questions related to the issue submitted by plaintiffs' counsel. I do not believe there was error in prohibiting asking those *specific* questions in the *manner* in which they were framed. There is no showing that the area could not have been explored by less slanted questions, and in fact, some jurors were excused when a bias concerning medical malpractice cases was shown.

¶ 3 Essentially, we do not know what happened during *voir dire*. The notes of testimony do not begin until November 17, 2003,[6] after the jury had been selected. After explaining to the court the reasons why he wanted the questions asked, the trial judge replied:

> The Court: So, basically, you are placing an objection on the record because I would not allow these questions to be read?
>
> Mr. Daniels: Yes, please.

(N.T. 11/17/03, p. 3.)

¶ 4 Certainly an inference may be drawn that the trial court had at least informally told counsel he could not ask the questions at issue. However, given the specific process in question, I do not believe that it is evident that Plaintiffs' counsel obtained a ruling, formal or informal, directly from the court prior to jury selection.

¶ 5 Even if we proceed on the assumption that counsel was told in no uncertain terms that he could not ask questions 27, 28, 29, and 30 prior to jury selection and the notes of testimony of November 17 are merely a formalization of that prior event, the problem is not solved. The questions, as submitted, are improper. They are blunt instruments which are purportedly being asked to obtain specific information.[7] At least one of the questions, number 30, reveals an inherent bias, referring to the "so-called" medical malpractice crisis. Counsel might as well have submitted a question referring to "defendants who just arbitrarily refuse to pay claims." Thus, I would find no error in denying permission to ask these specific questions.[8]

---

**6.** The official record did not initially contain any notes of testimony. In response to an order by this Court, belatedly they were attached. It is now clear that the voir dire itself was not transcribed.

**7.** The juror questionnaire contains general questions seeking general responses. Questions seeking specific information need to be so tailored. Questions such as were proposed by plaintiffs could produce a "blurt-out" answer that could taint the entire panel.

**8.** The majority has similar reservations, at least, about the questions, stating: "However, in concluding as we have, we do not necessar-

¶ 6 My disagreement with the majority lies primarily in my belief it is impossible to determine the particular facts presented, or not presented, in this specific case.

¶ 7 The majority states in footnote 2 of its opinion:

Plaintiffs registered their formal objection to the denial by the trial court of their right to have these questions submitted to the jury just prior to the start of trial. See N.T. *Voir Dire* Objections, 11/17/03, at 2–3 (a proceeding held in open court out of the presence of the jury). It is evident from statements made by Plaintiffs' attorney and the court that the questions had been timely submitted and had been rejected prior to the start of the jury selection process.

¶ 8 However, from the record, it is impossible to determine exactly what happened during the jury selection process. We do not know whether plaintiff's counsel preserved his right to inquire about the so-called "medical malpractice crisis" in less biased terms. We do know the subject came up in individual *voir dire*. Since there is no record of the day of the *voir dire*, we do not know if counsel requested that the judge otherwise allow him to cover the area of the "medical malpractice crisis," or even requested to create a record to show that nothing about the medical malpractice crisis could be addressed in *voir dire*. All we know is that after the

jury was selected there was an objection noted that indicated that certain specific questions were not permitted by the trial. This is not enough of a record to justify reversal.[9]

¶ 9 There is nothing on the official record to determine what counsel did beyond submitting objectionable questions to explore the "medical malpractice crisis" issue.[10] If counsel believed the issue to be of sufficient merit, counsel should know that the official record must include the relevant testimony/evidence that allows for appellate review. *See* Pa.R.A.P. 2152. If the official record does not sufficiently reflect what transpired, the issue will generally be deemed waived. *See* Pa.R.A.P. 2101. Here, all that is noted is that the particular questions *might* have been prohibited by the trial judge. Because there was no contemporaneous record made during the jury selection we have only supposition.

¶ 10 There are a multitude of ways to investigate potential bias because of the "medical malpractice crisis" without asking those specific questions. For example, the majority noted the solution offered by Utah in *Barrett v. Peterson*, 868 P.2d 96 (Utah Ct.App.1993). After denying Barrett permission to ask 11 questions regarding tort-reform, the Utah Court of Appeals determined the trial court should have taken it upon itself to ask questions on the

ily endorse questions proffered by Plaintiffs." (Majority Opinion at —— Pa. ——, 893 A.2d at 143.)

9. It is likely that the jury was selected on the Friday before the Monday trial starts. In this case that would mean the jury was selected on November 14, 2003, three days before the relevant objection was formally lodged. It appears that the judge was not present for the *voir dire*, and that it was conducted by counsel or by a member of the judge's staff or the court staff. In this circumstance, usually the

judge is available if there is a disagreement over a particular question that cannot be resolved. Therefore, the lawyer should have the opportunity to have a judicial ruling on a question *before* the entire jury is selected. If plaintiff's counsel did not object to the preclusion of alternate means to explore the "medical malpractice" issue other than by his questions, he has waived this issue. Without a record, we cannot tell.

10. We note that we cannot remand to the trial court for additional findings by the trial judge, as she is no longer on the bench.

subject. Then the questions could have been asked in a neutral manner.

¶ 11 This leads back to the inadequacy of the official record. Because we have no clear indication of record what happened, we do not know for certain if such solution was proposed and rejected by Capoferri. We do not know if Capoferri wanted these specific questions asked of the jury panel and no others. We do not know to what extent the questions denied could have been worked into follow-up questions.[11] Rather, all we have is the agreement of counsel that he objects because the court would not allow *"these* questions to be read." *See* N.T. 11/17/03 at 3 (emphasis added).

¶ 12 I note during argument before our Court counsel stated he was not allowed to make the formal objection on the record until *voir dire* was completed. Even if true,[12] this still does not relieve counsel from the obligation of insuring a complete record is transmitted for our review. *See* Pa.R.A.P. 1921. Counsel could have described the prior proceedings on the record on November 17. Counsel could have had *voir dire* taken down by the court reporter and transcribed. Counsel could have made use of Pa.R.A.P. 1923 or 1924 and entered a statement in absence of transcript or agreed statement of record into the official record.[13] Because none of these options was taken, the record on this issue is incomplete. Because the record is incomplete, I do not believe we are in a position to grant relief on the issue.

¶ 13 If we do not accept the inference that the Capoferri's jury questions were ruled on prior to jury selection, then the objection is clearly untimely and the issue should be deemed waived. One of the primary objectives of making an objection is to give the trial court the opportunity to correct the mistake. Once the jury has been selected (and because we do not have any notes of testimony, we do not even know if the jury had been sworn in) it is too late to complain about the selection process. *See Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 396 (2003) (timely objection required to allow trial court remediation of error). It is improper to wait until the entire jury is selected, and then, reflecting that one does not like the composition of the jury as finally selected, retroactively object that questions were not permitted. That should be considered a waiver of any objections, since the judge could have been contacted during the *voir dire,* not after the jury was selected. If for some reason the judge was not available in this case, that should have been placed on the record. It was not.

¶ 14 It also is questionable whether it would have been an abuse of discretion for the trial judge, who has the flavor of the courtroom, to prohibit specific questions about "tort reform" or a "medical malpractice crisis." The standard questions cover a number of areas where possible bias is

---

11. We do know that to some extent the information sought was elicited in follow-up questioning, as counsel admitted such in the record we do have. Counsel stated to the court: "And, as a matter of fact, during the course of our individual *voir dire* of the jury, separate and apart from the rest of the group, quite by accident, quite by accident, because they identified their occupation, and that led to another question, in fact, evidenced prejudice." See N.T. 11/17/03 at 3.

12. I do not mean to question counsel's veracity. This is simply recognition that statements made during argument are not evidence and are not a part of the official record.

13. Capoferri's second issue, an evidential question, suffers a similar fate. We are asked to review the trial court's ruling admitting certain evidence without having the benefit of the notes of testimony.

explored. It appears counsel was permitted to question the potential jurors individually. Areas of possible prejudice could have been covered further in that way. Again, we just do not know what happened during the *voir dire*.

¶ 15 Because I believe we do not have a sufficient record to determine whether the objection was timely or whether there were other means available to explore the subject matter,[14] I am constrained to dissent.

14. If the state of the record is such that I cannot even determine whether the objection was timely, this too supports my conclusion that the record is insufficient to make a substantive ruling.