# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-KA-01763-SCT

*WILLIE NICK JACKSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/16/1999 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ALLAN D. SHACKELFORD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/09/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/30/2001 |

**BEFORE BANKS, P.J., SMITH AND WALLER, JJ.**

**BANKS, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This case is before this Court on appeal from a judgment entered on a jury verdict convicting Willie "Nick" Jackson of the crime of capital murder. Because we conclude that the evidence is sufficient to sustain a guilty verdict, the trial court did not err in limiting the scope of Jackson's voir dire, the trial court did not err in refusing the defense's proffered instruction, and the verdict was not against the overwhelming weight of evidence, we affirm.

## I.

¶2. On June 21, 1993, eighty-one year old Andy Watson ("Watson") was stabbed to death at his home on Oasis Street in Quitman County, Mississippi. Watson collected water bill payments for the local water association. Two witnesses, Cloretta Qualls ("Qualls") and and Neurida Johnson ("Johnson"), testified that they saw Watson on the day of his death. Qualls testified that at approximately twelve noon she spoke with Watson at his house while paying her mother's water bill. Later that day, around 6:30 p.m., Johnson went to Watson's house to pay her bill. She testified that she saw Watson lying on the floor and went to a neighbor's house to call for help. Johnson testified that when she viewed Watson's body through the screen door, he was lying on his stomach and his head was closer to the door than his feet.

¶3. After arriving on the scene, Deputy Oliver Parker ("Parker") summoned Sheriff Jack Harrison ("Harrison") and Deputy Bill Cole ("Cole"). Deputy Parker testified that when he arrived, several crime scene technicians were in the house and Watson's head was positioned away from the door. Sheriff Harrison also testified that the crime scene had been slightly altered after he arrived.

¶4. In 1998, five years after Watson's death, Willie "Nick" Jackson ("Nick") and his brother Larry ("Larry") Jackson were indicted for murder during the commission of a robbery, a capital offense. The indictments were based on the statements of Mattie Reed ("Reed"), Rhonda Carpenter ("Carpenter") and Daniel Faulkner ("Faulkner").

¶5. At the time of the murder, Larry Jackson lived with his girlfriend Mattie Reed in a house belonging to Reed's mother, Mattie Carpenter. Rhonda Carpenter, Mattie Carpenter's other daughter, also lived in that house with her boyfriend, Faulkner.

¶6. Reed testified that around noon on June 21, 1993, Nick Jackson came to Reed's house and asked Larry Jackson to borrow his car, but Larry refused. Subsequently, Larry and Nick left together and did not return until later that night. Reed stated that earlier that day when Larry left he was wearing a shirt and blue jeans, he returned that evening wearing coveralls. Nick returned wearing the same outfit that he was wearing when he left, a peach and brown shirt and blue jeans; however, the outfit was now splashed with blood. Nick informed Reed that he had been in an accident, but Reed noted no injury on Nick. Nick changed into clothing belonging to Larry and left the house. Reed stated she never saw the peach and brown shirt and pants again.

¶7. Reed further testified that the next morning she went to use Larry's car to go to the store. She stated that the car was parked behind the house which was unusual because normally Larry parked it in the driveway. When she got in the car, she saw smears of blood in the car, so she decided to walk to the store. Later, Larry left the house and returned with Nick. When they returned, the interior of the car had been changed. The brothers also returned with cigarettes, beer, drugs, and money. Reed stated that she asked Larry where the money came from for the items because she previously did not see Larry with any money. At trial after an objection by defense counsel, the judge conducted an evidentiary hearing in chambers. In chambers Reed stated that Larry told her "We took care of that old man on Oasis Road yesterday." She also stated that Nick told Larry that he need to quit talking so much and that he needed to holler at him outside. This testimony was excluded by the trial court. When she returned to the courtroom, Reed testified that the Nick and Larry went outside of her window, and she heard Nick tell Larry that he was talking too much, he needed to let things die down, and he was going to get them in trouble.

¶8. Rhonda Carpenter testified that on the morning of June 22, 1993, she and Faulkner went to the garbage dump together. They looked in the garbage and found a peach and brown striped shirt and a pair of pants that had blood on the clothes. She stated that she and Faulkner took the clothes to the Mayor's Office in Lambert and gave them to the police department.[1] Carpenter further testified that she heard Larry say "We took him out, we took the man, took this man out," and Nick replied "Shut up man, you talk too much. You going to get us in trouble." Faulkner testified that he had previously seen either Nick or Larry wearing the peach and brown shirt.

¶9. Mattie Carpenter testified that she overheard Nick telling Larry that he had wrestled with an old man out in the weeds and finally got the best of him.

¶10. The jury returned a verdict of guilty of capital murder. After further deliberation, the jury returned with a sentence of life imprisonment without parole. Following the denial of his motion for a JNOV or a new trial, Jackson filed a timely notice of appeal.

**II.**

¶11. When reviewing the sufficiency of evidence, this Court looks to all of the evidence before the jurors to determine whether a reasonable, hypothetical juror could find, beyond a reasonable doubt, that the defendant is guilty. *Jackson v. State*, 614 So.2d 965, 972 (Miss. 1993); *Wetz v. State*, 503 So.2d 803, 808 (Miss. 1987). In an appeal from an order denying a motion for JNOV, the sufficiency of the evidence as a matter of law is viewed and tested in the light most favorable to the State. *Tait v. State*, 669 So.2d 85, 88 (Miss. 1996); *Smith v. State*, 646 So.2d 538, 542 (Miss. 1994); *May v. State*, 460 So.2d 778, 781 (Miss. 1984).

### a.

### 1.

¶12. Jackson contends that when there is no evidence that the defendant committed the crime, the case must be reversed and a judgment of not guilty entered. *Id.* Jackson charges that there is no evidence that he was present at the murder or knew anything about the murder. He alleges that the State based its entire case on the statement, "Man we took him out. We took this man out," which was allegedly made in his presence and with which he allegedly concurred. First, Jackson posits that there is no evidence concerning what "old man" was taken care of. Second, Jackson avers that the evidence does not place him at the Watson's residence or even support that he knew about Watson's murder. Moreover, Watson alleges that Larry did not make the comment referring to an old man in his presence.

¶13. Jackson refers to Mattie Carpenter's statement where she stated that she heard Nick Jackson tell Larry that he wrestled some man in the bushes until he wore the man down and got him where he wanted him. It follows, Jackson contends, that evidence about the struggle exculpates him rather than inculpates him since the evidence indicates that Watson was murdered in his living room.

¶14. Reed's testimony referring to the old man on Oasis Road was excluded from evidence. However, there is more than sufficient evidence that would allow a reasonable and fair-minded juror to find Jackson guilty of murder. Reed stated that Nick told Larry to keep quiet and let things die down before they got in trouble. Rhonda Carpenter testified that Larry also stated that "we took care of that old man," with "we" referring to he and Nick. Mattie Carpenter further testified to hearing Nick state that he had to wear the old man down.

¶15. Nick returned to Carpenter's house wearing a peach and brown shirt and pants covered in blood that was later found in the garbage dump. Reed also testified that she saw blood smears in Larry's car the next day. Larry left with the car and returned with new interior. Further, the day after Watson was murdered Nick and Larry returned to the Carpenter's house with money, beer, drugs and cigarettes. When presented with this evidence, a reasonable and fair-minded juror could find Jackson guilty of murder. *See White v. State*, 722 So.2d 1242, 1246 (Miss. 1998); *May v. State*, 460 So.2d at 781.

### 2.

¶16. Jackson also maintains that Sheriff Harrison testified that $22.00 was left in plain view on a table next to the victim and the victim's watch was left on his arm. Jackson alleges because these items were present at the crime scene, this is evidence that a robbery did not occur. Jackson cites *Walker v. State*, 671 So.2d 581 (Miss. 1995) for the holding that there must be proof of the underlying crime in the instant case to the same extent and degree as if the charge of robbery were standing alone in order to support a conviction of

capital murder.

¶17. Jackson argues that the only evidence of robbery is the alleged missing wallet of Watson and the fact that his left pocket, where Watson normally carried the wallet, was turned inside out. He further submits that when Johnson, the witness who found the body, viewed the body she did not see the pocket inside out, in spite of the fact that Sheriff Harrison testified that the pocket was easily visible when he arrived. Jackson contends that by the time Harrison arrived the crime scene had been contaminated. Therefore, he asserts it is plausible that crime scene technicians could have moved the pocket.

¶18. The State maintains that there is sufficient evidence to support a robbery and a reasonable and fair-minded juror could find that the defendant was guilty of robbery. In *Cabello v. State*, 471 So.2d 332, 349 (Miss. 1985), the State argued that this Court determined that evidence of the absence of money on the victim's premises, the open safe door, and one of the defendants asking his older son for "the money" as they were leaving Corinth, was sufficient to prove that the murder was committed while the defendant was engaged in the commission of robbery and for pecuniary gain.

¶19. Deputy Parker testified that he noticed that Watson's left, back pocket was turned inside out when he arrived. Further, he did not see any money lying on the table. Sheriff Harrison testified that he arrived after Deputy Parker and other law enforcement officials and saw the money uncovered on the table. Captain Ellis took the photographs that were admitted into evidence. Captain Ellis stated that, before he took pictures of the money, he moved papers that were covering the money and in his opinion the papers had not previously been disturbed. He also testified that the Watson's rear pocket was turned inside out and that he did not find a wallet in the vicinity.

¶20. Reviewing the evidence in the light most favorable to the State, a reasonable, fair-minded juror could find the absence of money in the house supports a finding that this murder was committed in the commission of a robbery. Here, Watson collected payments for the water company, and one witness testified to paying her bill on the day of his death. It is reasonable to believe that Watson collected other payments on that day, and there was no evidence of any other money in the vicinity other than the money covered beneath a stack of papers. The officers also testified that Watson's wallet was missing from his back pocket where he normally carried it and his pants pocket was turned inside out. It is reasonable to believe that someone hurriedly searching for money or stealing Watson's wallet would leave the back pocket turned inside out. This evidence is more than sufficient to prove an underlying crime of robbery. Thus, this argument is without merit.

**b.**

¶21. The standard of review in examining the conduct of voir dire is abuse of discretion. *Berry v. State*, 575 So.2d 1, 9 ( Miss. 1990) (citing *Billiot v. State*, 454 So.2d 445, 457 (Miss. 1984)). Abuse of discretion will only be found where a defendant shows clear prejudice resulting from undue lack of constraint on the prosecution or undue constraint of the defense. *Davis v. State*, 684 So.2d 643, 652 (Miss. 1996).

¶22. Jackson submits that the trial court, in error, sustained objections to questions he asked prospective jurors. The first error occurred, Jackson argues, when defense counsel asked, after reminding the jury that the law presumed him innocent at that stage of the trial, "Do you, in your heart, presume him to be innocent right now?" Jackson argues that as a defendant, it is in the interest of justice for a potential juror to answer

this question so that he may properly exercise his peremptory challenges. He asserts that he had a right to probe into the jurors' attitudes regarding his innocence. Thus, he urges, it was prejudicial not to allow him to pursue this line of questioning on voir dire.

¶23. The second error occurred, Jackson alleges, when defense counsel asked the jurors whether anyone had openly supported a witness, Sheriff Harrison, in his bid for re-election. Jackson argues this question was necessary to discern the nature of any relationship a juror had with the witness. Jackson contends that denying a defendant the opportunity to get at the real state of mind of the juror constitutes reversible error.

¶24. The State maintains that the process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. *Kolberg v. State*, 704 So.2d 1307, 1323 (Miss. 1997). The State admits, however, that one of the purposes of voir dire examination is "to enable counsel to ascertain whether there is ground for a challenge of a juror for cause, or for a peremptory challenge."*Tighe v. Crosthwait*, 665 So.2d 1337, 1341 (Miss. 1995). The State argues that this Court has recognized that the presumption of innocence has long been recognized as the logical corollary of the principle that the prosecution bears the burden of proof beyond a reasonable doubt. *Hickson v. State*, 472 So.2d 379, 383 (Miss. 1985)) (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16, 99 S. Ct. 2781, 61 L.Ed. 2d 560 (1979)). The State concludes that Jackson only had the right to ask if the jurors understood that the law presumed Jackson to be innocent, not if in their heart, they believed Jackson to be innocent.

¶25. The question concerning whether the jurors believed in their hearts that Jackson was innocent, had the potential to be confusing. A defendant is accorded a legal presumption of innocence. Contrary to the implication of the question, jurors need not have formed personal beliefs in actual innocence. They need only be willing to presume that he is innocent until convinced of guilt beyond a reasonable doubt. Therefore, the court did not abuse its discretion in sustaining the objection to this question. *Davis v. State*, 684 So.2d at 651.

¶26. The inquiry into public support for the sheriff, however, did not have any potential for confusion. Absent discrimination against certain classes of jurors, litigants are free to exercise peremptory challenges based upon views that may be fanciful. This may include a view that one who publicly supports a candidate for office has manifested such trust in that person as to accord that person's testimony more weight and credibility than another witness. The objection to this question should not have been sustained.

¶27. The error is harmless, however. *Tighe v. Crosthwait*, 665 So.2d at 1339 (finding harmless error where the trial court refused to allow medical malpractice plaintiff to ask questions during voir dire to determine if prospective jurors had been exposed to and/or affected by media campaign on tort reform). The credibility of the sheriff was of little importance in the trial of this case because the testimony that he gave was not in dispute. The primary evidence consisted of testimony from Jackson's associates and their relatives. Some of the sheriff's testimony concerning the crime scene, the only thing that the sheriff personally witnessed, however, is used by Jackson in support of his arguments.

c.

¶28. Because admissible evidence was lost, Jackson argues that the trial court erred in refusing his proffered adverse inference instruction D-1 which states:

The Court instructs the jury that if you believe that Daniel Faulkner and Rhonda Carpenter retrieved clothes with blood on them from a garbage container in front of Maggie Carpenter's house; and if you further believe that Daniel Faulkner and Rhonda Carpenter took the clothing to law enforcement officials; then in such an event of the failure of the State of Mississippi to be able to produce this clothing at this trial creates an inference that their production would have been detrimental to the prosecution of this case.

He contends that the instant case is factually similar to *DeLaughter v. Lawrence County Hosp.*, 601 So.2d 818 (Miss. 1992). In *DeLaughter*, this Court stated:

The jury was entitled to be told the original hospital record would not be produced in court, as that was a relevant fact. The hospital had the duty to give an adequate explanation for the absence of the original hospital record. Therefore, the jury was entitled to be told why the original record was missing, also a relevant fact.

\* \* \*

In sum, we find that the hospital chart was not fully reconstructed. We further find that the trial court erred in failing to place the burden of proof on the hospital to show that the chart was not lost or destroyed by the hospital. In addition, we find that the trial court erred in failing to give an instruction on the spoilation issue. We recognize that DeLaughter did not submit a proper instruction on this issue; however, based upon the record now before us, we cannot say that the error was harmless.

*Id.* at 821, 823. Jackson argues that, as in *DeLaughter*, he is entitled to an instruction which informs the jury of the missing evidence.

¶29. The State alleges that Jackson fails to argue that this evidence would have been exculpatory. It contends that the State's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." *Tolbert v. State*, 511 So.2d 1368, 1372 (Miss. 1987) (quoting *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413, 422 (1984)). Further, the State acknowledges that no comparable evidence could be procured. However, the State maintains that Jackson makes no effort to point out whether the clothes were exculpatory and whether that fact was apparent before the clothing was lost. The State maintains that there was no prosecutorial misconduct and thus, the inference of prejudice does not arise.

¶30. The rule governing the State's destruction of physical evidence is discussed in *Tolbert,* 511 So.2d at 1372, in which this Court held that the State's duty to preserve evidence is limited to evidence that is expected to play a significant role in the defense. To play a constitutionally significant role in the defense, the exculpatory nature of the evidence must have been (1) apparent before the evidence was destroyed and (2) of such a nature that the defendant could not obtain comparable evidence by other reasonable means. *See also California v. Trombetta,* 467 U.S. at 489; *Johnston v. State*, 618 So.2d 90, 92 (Miss. 1993).

¶31. Other than the testimony of witnesses stating that the Jackson was seen wearing this clothing, this is not a case where the State uses experts to say that the blood on the clothing was Watson's, without Jackson having the ability to contradict this testimony or test the clothing. *See Banks v. State*, 725 So.2d 711 (Miss. 1997) (conviction reversed and remanded where State's expert destroyed evidence despite apparent exculpatory nature of evidence which was the only evidence linking the defendant to the victim's house).

¶32. This argument ultimately fails because there is no evidence of prosecutorial misconduct in an attempt to frame Jackson for this murder. Jackson's proffered instruction serves to raise an inference that because the evidence is missing it is assumed detrimental to the State's case. *Tolbert,* nevertheless, provides that:

> It is a general rule that the intentional spoilation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that this evidence would have been unfavorable to the case of the spoliator. *Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.*

*Tolbert*, 511 So.2d at 1372-73 (emphasis added). Again, there is no evidence presented by either party that the destruction of the evidence was intentional or indicated fraud or a desire to suppress the truth. Thus, it was within the trial court's discretion to refuse the proffered instruction.

### d.

¶33. Jackson asserts that the evidence, even when taken in the light most favorable to the State, only shows that he and Larry Jackson did bodily harm and take some money from some unknown person. Jackson also notes that Mattie Jackson testified that the fight that Nick had with the "old man" occurred in the weeds and law enforcement officials stated that there was no evidence of a struggle outside of Watson's house.

¶34. Jackson cites *May v. State*, 460 So.2d at 781, for the proposition that even though there is sufficient evidence to prevent peremptory instruction of not guilty there may still be such limited evidence that this Court must intervene and grant a new trial.

¶35. The State argues that the verdict is not against the overwhelming weight of evidence because Larry Jackson was overheard saying, "we took care of that old man, yesterday." Watson was 81 years old, and he was killed the day before that statement was made. Watson's wallet was taken and not recovered.

¶36. The State surmises that contradictions in the testimony are questions for the jury. *Hughes v. State,* 724 So. 2d 893, 896 (Miss. 1998); *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983). Moreover, factual disputes are properly resolved by the jury in a criminal prosecution and do not mandate a new trial. *Benson v. State*, 551 So. 2d 188, 193 (Miss. 1989).

¶37. The verdict is not against the overwhelming weight of evidence. Again, Deputy Parker testified that he noticed that Watson's left, back pocket was turned inside out when he arrived. Captain Ellis testified that he took the photographs that were admitted into evidence. Further, Captain Ellis testified that before he took pictures of the money he moved papers that were covering the money and in his opinion that papers had not previously been disturbed. He also testified that Watson's rear pocket was turned inside out and that he did not find a wallet in the vicinity. All this evidence indicates that a robbery took place at Watson's residence.

¶38. Reed stated that Nick Jackson told Larry Jackson to keep quiet and let things die down before they got in trouble. Rhonda Carpenter testified that Larry also stated that "we took care of that old man," with "we" referring to he and Nick. Mattie Carpenter further testified to hearing Nick state that he had to wear the old man down.

¶39. After leaving the Carpenter's house, Reed testified that Nick returned wearing a peach and brown shirt and pants covered in blood that was later found in the garbage dump. Larry returned wearing coveralls that

he usually kept in the car. Reed also testified that she saw blood smears in Larry's car the next day. Larry left with the car and returned with a new interior.

¶40. Further, Reed and Carpenter testified that the day after Watson was murdered Nick and Larry returned to the Carpenter's house with money, beer, drugs and cigarettes. They also stated that neither Nick, nor Larry, was known to have money before then. We conclude that the fact that jurors found that Nick was involved with the murder was not against the overwhelming weight of the evidence.

### III.

¶41. For the foregoing reasons, the judgment of the trial court is affirmed in all respects.

¶42. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE SHALL RUN CONSECUTIVELY WITH ANY AND ALL SENTENCES PREVIOUSLY IMPOSED.**

**PITTMAN, C.J., McRAE, P.J., SMITH, MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**

1. By the time of the trial this clothing was lost by the Lambert Police Department.