IRVING, P.J.,
for the Court:
¶ 1. A Hinds County grand jury indicted Charles Johnson for murder, unlawful possession of a firearm by a convicted felon, and two counts of armed robbery. The indictment also provided that Johnson was a habitual offender and sought an enhancement of the sentence based on Johnson’s use of a firearm. After a two-day trial, a Hinds County jury acquitted Johnson of *619 murder and both armed-robbery charges. The jury, however, convicted him of being a convicted felon in possession of a firearm. The circuit court sentenced Johnson, as a habitual offender, to ten years in the custody of the Mississippi Department of Corrections and also sentenced him to an additional ten years pursuant to the firearm-enhancement statute.
¶ 2. Feeling aggrieved, Johnson appeals and argues that the circuit court improperly restricted voir dire of the jury panel regarding pretrial publicity, erred by allowing a juror to return to deliberations after an allegation of misconduct, erred by prohibiting Johnson from introducing evidence regarding events related to the vol-untariness of his confession, erred in finding that he was a habitual offender, and erred by using the firearm-enhancement statute to enhance his sentence.
¶ 3. Finding no merit to Johnson’s first four issues, we affirm the circuit court’s judgment as to those issues. However, we find that the circuit court erred in enhancing Johnson’s sentence without having allowed the jury to determine whether the facts justified an enhancement in accordance with the firearm-enhancement statute. Therefore, we reverse and render the enhanced portion of Johnson’s sentence.
FACTS
¶ 4. On February 15, 2011, Johnson shot Eugene “Boosie” Roberts as Roberts sat in the passenger seat of a car parked at a home located on Culbertson Avenue in Jackson, Mississippi. As Johnson fled the scene of the shooting in his vehicle, he collided with a vehicle driven by Brenda Davis. He then aimed his gun at her and attempted to take her car, but the car would not start. A FedEx driver, Glen Coleman, witnessed the collision and stopped to see if he could help. As he stopped to offer assistance, Johnson approached him, aimed his gun at Coleman, and demanded the FedEx truck. Coleman complied. Johnson drove the truck to Clinton, Mississippi, where he abandoned it outside the home of Charles and Gabrielle Wells.
¶ 5. The next morning, Johnson turned himself in to Deputy Danny Johnson (no relation to the appellant) of the Hinds County Sheriffs Department. Deputy Johnson transported Johnson to Jackson and released him into the custody of the Jackson Police Department (JPD). JPD Detectives Eric Smith and Felix Hodge interviewed Johnson at JPD headquarters. Detective Smith informed Johnson of Johnson’s rights, and Johnson confessed to killing Roberts but insisted that he did so in self-defense because Roberts and his friends, allegedly members of a local gang, were planning to kill him after robbing him of his drugs and money. He denied trying to take Davis’s ear at gunpoint. He also denied that he used a gun to take the FedEx truck from Coleman. He stated that he only wanted to get back to Clinton, where he thought that he would be safe. Johnson then led Detective Smith and other JPD officers to the gun that he used during the incident. Thereafter, JPD transported Johnson to the Hinds County Detention Center in Raymond, Mississippi, where he was allegedly assaulted by several officers from the Hinds County Sheriffs Department.
¶ 6. Prior to trial, the circuit court conducted a suppression hearing, where both detectives testified. Each of them testified that Johnson was informed of his rights prior to giving his confession and that neither of them threatened Johnson before, during, or after his confession. The court denied Johnson’s suppression motion, and his confession was admitted during the trial.
*620 ¶ 7. During the State’s case-in-chief, Baraka Buckley, who witnessed the shooting, testified that on the day of the incident, she and Roberts were sitting in her car talking. She saw Johnson arrive in his truck. He exited the truck, approached the home and talked with people who were standing around, and thereafter walked to the passenger side of Buckley’s vehicle where he spoke briefly with Roberts. Johnson then pulled out a gun and shot Roberts several times. After the shooting began, Buckley grabbed her son, who was sitting in the backseat of the vehicle, and ran to an abandoned house down the street and remained there until she felt that it was safe to return to her vehicle. She later positively identified Johnson as the shooter.
¶ 8. After closing arguments, the State reported that it had been contacted by Patricia Stamps, Roberts’s aunt, who informed the State that juror Vivian Manning had a preexisting relationship with a member of Roberts’s family. However, the State was not informed of the identity of the family member or the details of the possible relationship with the family member. Johnson requested a mistrial based on juror Manning’s alleged misconduct, which the circuit court denied.
¶ 9. The court allowed the State and Johnson’s counsel to question Stamps. Stamps testified that she knew juror Manning as Vivian Green and that they had spoken to each other outside of the courthouse. According to Stamps, the two only greeted each other. Stamps further testified that Manning did not know Roberts, but had come to Roberts’s grandmother’s house to offer her condolences approximately two months after the incident.
¶ 10. Manning testified that she did not know Roberts. She admitted that she had visited Roberts’s aunt Michelle[1] and Michelle’s mother several months before Roberts’s death, but claimed that she was unaware at the time that either woman was related to Roberts. Manning denied visiting Michelle’s mother, who was also Roberts’s grandmother, after Roberts’s death. Manning also testified that she did not know Stamps. Even though both Manning and Stamps testified during the investigative hearing, neither Johnson’s counsel nor the State requested that Stamps appear in the presence of Manning to resolve the question of whether Stamps and Michelle were the same person.
¶11. Manning further testified that even though she knew members of Roberts’s family, she had not discussed the case with any of them before the trial or during the trial; had been a fair and impartial juror throughout the trial; and would continue to be fair and impartial throughout deliberations. The circuit court allowed Manning to return to deliberations. Shortly afterwards, the jury returned with not-guilty verdicts on the murder and armed-robbery charges, and a guilty verdict on the felon-in-possession-of-a-firearm charge.
¶ 12. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

I. Voir Dire

¶ 13. Johnson contends that the circuit court violated his constitutional right to a fair and impartial jury by improperly restricting voir dire of the jury panel regarding pretrial publicity. At trial, Johnson’s counsel requested individual sequestered voir dire of each potential juror that had *621 heard or read information about Johnson’s case or the subsequent assault of Johnson by Hinds County law enforcement officials. According to Johnson, the court’s limitation on voir dire led to impaneling a biased jury-
¶ 14. “[T]he decision of whether to allow individual sequestered jury voir dire should be left to the sound discretion of the [circuit] court.” Le v. State, 913 So.2d 913, 923 (¶ 14) (Miss.2005); see also URCCC 3.05. Therefore, “[w]hen reviewing the conduct of voir dire, [appellate courts apply] an abuse of discretion standard.” Jordan v. State, 995 So.2d 94, 102 (¶ 11) (Miss.2008) (citing Jackson v. State, 791 So.2d 830, 835 (¶ 21) (Miss.2001)). An “abuse of discretion will only be found where a defendant shows clear prejudice resulting from undue lack of constraint on the prosecution or undue constraint on the defense.” Id. (quoting Jackson, 791 So.2d at 835-36 (¶ 21)). The jury-selection process is proper if it gives the defendant “a fair opportunity to ask questions of [the potential] jurors which may enable the defendant to determine his right to challenge that [potential] juror[.]” Stevens v. State, 806 So.2d 1031, 1062 (¶ 139) (Miss.2001) (quoting McLemore v. State, 669 So.2d 19, 25 (Miss.1996)) (internal quotation marks omitted).
¶ 15. During voir dire, Johnson’s attorney opined to the court that the case was “well publicized for two reasons. One, it was about the FedEx truck. It was all over the news. And, two, Charles Johnson was beaten[,] and there were [thirteen] officers fired in relation to his beating.” The State agreed that the case received some publicity for a couple of weeks, but could not say that the general public would connect the FedEx-truck case to the “jail-beating case.” Johnson’s attorney suggested that the parties be allowed to individually voir dire the venire members who indicated that they had “read or heard about this case.” In response, the State suggested filtering the venire by asking those members that had heard about the case if they could “disregard anything [they] read in the media and decide this case solely on what you see and hear in this courtroom.” The State was not opposed to individual voir dire if some extraordinary response necessitated it. The court agreed by stating, “I [am] sure a good number have heard about it, but that [does not] exclude them or even mean that they [cannot] be a fair and impartial juror.” Although Johnson’s counsel disagreed with the process, he agreed to ask the general question and then request individual voir dire of venire members based on their responses.
¶ 16. Johnson’s attorney then asked if any of the members of the venire had heard or read anything about “a shooting[,] ... a man fleeing in [a] FedEx truck, ... [and] Mr. Johnson being beaten by law enforcement officials.” Out of the forty-six members of the venire, twenty-five responded affirmatively to the compound question. The court did not prevent Johnson’s counsel from asking those twenty-five members of the venire which of the three incidents they were familiar with. When Johnson’s counsel requested individual voir dire of those twenty-five venire members, the circuit court denied the request. However, the court allowed counsel to ask whether any of the twenty-five venire members had formed an opinion regarding Johnson’s guilt or innocence, and if they had formed an opinion, whether they could set that opinion aside. Johnson’s counsel continued:
Ladies and gentlemen of the jury — jury, for anybody who raised their hand, have any of you all formed an opinion as to Mr. Johnson’s guilt or innocence from what you’ve heard? Anyone here?
*622 (NO RESPONSE)
I take it by your silence your answer’s no.
¶ 17. Johnson relies on Nebraska Press Ass’n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), to insist that the circuit court should have allowed his attorney to individually voir dire the venire members. We fail to see how Stuart provides support for Johnson’s position, as Stuart focused on restricting “reporting or commentary on judicial proceedings held in public” rather than on restricting voir dire. Id. at 570, 96 S.Ct. 2791.
¶ 18. Johnson also suggests that this Court adopt the “acceptable procedure” described by the United States Court of Appeals for the Fifth Circuit in United States v. Davis, 583 F.2d 190, 197 (5th Cir.1978). In Davis, the district court noted that the crimes and the circumstances surrounding the trial were the subject of extensive publicity, and every venire member had heard about the case. Id. at 196. The media had sensationalized the crimes by focusing on the violence of the crimes, the purpose behind the crimes, the crimes’ repercussions, and the defendants’ backgrounds. Id. Although the Fifth Circuit ultimately determined that the district court erred in not conducting in-depth voir dire when faced with those circumstances, the court also noted that “[tjhough separate examination of jurors is sometimes preferable, it is not necessarily required.” Id. at 196-97. The court later noted that “[a] juror’s impartiality is not necessarily destroyed when he is exposed to pretrial publicity. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.” Id. at 197 (quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)) (internal quotation marks omitted).
¶ 19. Finally, we note that the United States Supreme Court specifically addressed individualized voir dire in the face of pretrial publicity in Mu’Min v. Virginia, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). In Mu’Min, sixteen out of twenty-six members of the venire revealed that they “had acquired ... information about the alleged offense or the accused from the news media or from [another] source[.]” Id. at 419, 111 S.Ct. 1899. The defendant requested that all of the potential jurors who had been exposed to pretrial publicity be excused from the venire. Id. at 420, 111 S.Ct. 1899. The court denied the defendant’s request and asked the potential jurors who indicated that they “had read or heard something about the case ... whether [they] had formed an opinion, and whether [they] could nonetheless be impartial.” Id. None of the members of the venire who eventually served as jurors indicated that they had “formed an opinion or gave any indication that [they were] biased or prejudiced against the defendant.” Id. at 421, 111 S.Ct. 1899.
¶ 20. In approving the trial court’s procedure, the Supreme Court stated that
[u]nder the constitutional standard, ... the relevant question is not whether the community remembered the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant. Under this constitutional standard, answers to questions about content alone, which reveal that a juror remembered facts about the case, would not be sufficient to disqualify a juror. It is not required that the jurors be totally ignorant of the facts and issues involved.
Id. at 430, 111 S.Ct. 1899 (internal citations and quotation marks omitted). As such, the trial court’s voir dire examination was sufficient. Id. at 431-32, 111 S.Ct. 1899.
*623 ¶21. Like the trial court in Mu’Min, the circuit court here allowed defense counsel to ask the members of the venire if they had formed an opinion based on the information that they had heard. Just as was the case in Mu’Min, none indicated that they had formed an opinion based on the information that they had read or heard. Thus, there was no need to engage in individual voir dire. The dissent states, “The jury misconduct that came to light during deliberations showed the actual harm and prejudice resulting from the circuit court’s refusal of individual voir dire.” Dis. Op. at (¶ 42). Apparently, the dissent has misread the record because, as we discuss later, the circuit court found that, notwithstanding Johnson’s allegations, no misconduct occurred. The record is clear that the members of the veni-re indicated that they had not formed an opinion about Johnson’s guilt or innocence. The members of the venire also assured the circuit court on more than one occasion that, despite whatever information they had received, they could render a fair and impartial verdict. “This Court gives great deference to such statements of impartiality.” Speagle v. State, 956 So.2d 237, 242 (¶ 14) (Miss.Ct.App.2006) (citing Le, 913 So.2d at 923 (¶ 14)). Johnson has failed to identify any evidence that demonstrated the need for individual voir dire. The court agreed to allow individual voir dire when an extraordinary response necessitated it. However, none of the members of the venire gave any such response. There is no evidence in the record indicating that the procedure followed by the circuit court was improper or prejudicial to Johnson. Furthermore, Johnson has not demonstrated that his inability to individually voir dire the members of the veni-re — to probe them about the information that they had received and from whom— resulted in prejudice.

II. Juror Misconduct

¶22. When the circuit court learned during the jury’s deliberations of the possibility that Manning had engaged in improper conduct as a juror, it immediately held a hearing on the matter and took testimony from Stamps and Manning. After the hearing, the court determined that there was no clear evidence of impropriety, denied Johnson’s motion for a mistrial, and allowed Manning to return to deliberations.
¶23. Johnson contends that Manning purposely hid her relationship with Roberts’s family from the attorneys during voir dire. He also argues that the circuit court erred by allowing Manning to return to jury deliberations following the investigation of her alleged misconduct, because allowing her to continue to deliberate with the other jurors tainted the verdict.
¶24. The circuit court’s determination that “the jury was fair and impartial will not be disturbed on appeal unless it appears clearly that the decision is wrong.” Williams v. State, 35 So.3d 480, 490 (¶ 36) (Miss.2010) (citing Fleming v. State, 687 So.2d 146, 148 (Miss.1997)). In Gladney v. Clarksdale Beverage Co., 625 So.2d 407, 418-19 (Miss.1993), the Mississippi Supreme Court stated:
Once an allegation of juror misconduct arises, then the next step is to consider whether an investigation is warranted. In order for the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption in this state of jury impartiality. Juror polling shall only be permitted by an attorney, outside the supervision of the court, upon written request.
At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe *624 that there was in fact an improper outside influence or extraneous prejudicial information.
“Further, [Rule 3.12 of the Uniform Rules of Circuit and County Court] allows the judge to declare a mistrial only when the harm done would render the defendant without hope of receiving a fair trial.” Moore v. State, 52 So.3d 339, 343 (¶ 14) (Miss.2010) (quoting Reed v. State, 764 So.2d 511, 513 (¶ 7) (Miss.Ct.App.2000)) (internal quotation marks omitted).
¶ 25. In Williams, our supreme court stated that
[а] juror’s failure to respond to a question in voir dire does not warrant a new trial unless the [circuit] court determines that the question propounded to the juror was (1) relevant to the voir dire examination, (2) unambiguous, and (3) such that the juror had substantial knowledge of the information sought to be elicited. If all three questions are answered in the affirmative, the court then determines if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror’s failure to respond.
Williams, 35 So.3d at 490 (¶ 36) (quoting Odom v. State, 355 So.2d 1381, 1383 (Miss.1978)) (internal citations and quotation marks omitted).
¶ 26. Here, once the State revealed the possibility of misconduct, the circuit court questioned Stamps to determine the extent of her alleged conversation with Manning. Both the State and Johnson’s attorney were then allowed to question Stamps. The court also questioned Manning regarding her alleged relationship with Roberts’s family. After the court finished with its questions, both sides were allowed to question Manning. Manning stated that she did not know Stamps and denied Stamps’s allegations that Manning had visited Roberts’s grandmother after his death and that she had discussed the case with Roberts’s family prior to serving as a juror. She declared that she had been fair and impartial throughout the trial and would continue to be fair and impartial throughout the rest of deliberations. There is no evidence that Manning behaved improperly or that Manning was not a fair and impartial juror.
¶ 27. Additionally, while Johnson contends that Manning intentionally hid her preexisting relationship with Roberts’s family, the record reveals that the members of the venire were never asked whether they knew or were acquainted with members of Roberts’s family. Also, it is undisputed that Manning did not know Roberts prior to serving as a juror in this case.
¶ 28. The dissent submits that the circuit court erred in allowing Manning to return to deliberations after “discovery of her knowledge of pretrial, extraneous information from the family of the victim,” and erred in not declaring a mistrial “due to Manning’s undisclosed pretrial knowledge of the case from Roberts’s family received during her visit to the family upon Roberts’s death.” Dis. Op. at (¶ 43). With respect, we must say again that the dissent apparently has misread the record or refuses to accept that it was the responsibility of the circuit court judge to determine the credibility of the testimonies of Stamps and Manning. We note again that the circuit court judge determined that there was no “clearly substantiated showing of a specific impropriety[.]” To find, as does the dissent, that Manning obtained “undisclosed pretrial knowledge of the case from Roberts’s family during her visit upon Robert’s death” is to substitute the dissent’s judgment for the judgment of the circuit court judge. Such an undertaking is without foundation in our jurisprudence. Accordingly, we cannot say that the circuit *625 court erred in allowing Manning to return to jury deliberations after finding that the allegations of her misconduct were unsubstantiated. As such, this issue is without merit.

III. Voluntariness of Confession

¶ 29. Johnson argues that he was not allowed to present testimony relevant to the circumstances surrounding his confession to Detectives Smith and Hodge and the subsequent discovery of the weapon. Specifically, Johnson challenges the circuit court’s exclusion of testimony regarding Johnson’s post-confession assault by Hinds County law enforcement officials.
¶ 30. Appellate courts apply the following standard when reviewing a circuit court’s ruling on a motion to suppress:
Since the [circuit] court sits as the fact-finder when determining the issue of whether an accused’s confession has been intelligently, knowingly[,] and voluntarily given, [appellate courts] will only reverse the [circuit] court’s determination of this issue when such determination is manifestly wrong. [Appellate courts] will not disturb the [circuit] court’s determination on the admissibility of a confession unless the [circuit] court applied an incorrect legal standard, committed manifest error, or rendered a decision which was contrary to the overwhelming weight of the evidence. A confession is admissible if the State has proven beyond a reasonable doubt that the accused’s confession was voluntary by showing that such confession was not the product of promises, threats[,] or inducement. With regard to the [circuit] court’s findings on the admissibility of a confession, ... where, on conflicting evidence, the [circuit] court makes such findings, [appellate courts] generally must affirm.
Richardson v. State, 74 So.3d 317, 322 (¶ 14) (Miss.2011) (internal citations and quotation marks omitted). After a lengthy suppression hearing, the circuit court determined that Johnson voluntarily confessed. Nevertheless, “[o]nce a confession is admitted into evidence, a defendant is entitled to submit evidence and have the jury pass upon the factual issues of its truth and voluntariness and upon its weight and credibility.” Wilson v. State, 451 So.2d 724, 726 (Miss.1984) (citation omitted).
¶31. While Johnson contends that the assault upon him by sheriff deputies, which occurred after his confession to Detectives Smith and Hodge, influenced the confession, he has failed to present any evidence to support this contention. The record reveals that the assault occurred hours after Johnson confessed to Detectives Smith and Hodge. Furthermore, there is no evidence that Detective Smith, Detective Hodge, or any other member of JPD was involved in Johnson’s assault. Detectives Smith and Hodge testified that they had not threatened or coerced Johnson into giving a confession and that Johnson was aware of his rights prior to giving his confession. Johnson did not testify. Based on these facts, we cannot find that the circuit court erred in not allowing Johnson to present testimony regarding his post-confession incident with Hinds County law enforcement officers. Accordingly, this issue is without merit.
1Y. Habitual Offender
¶ 32. Johnson argues that the circuit court erred in sentencing him as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev.2007), which states:
Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought *626 and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.
(Emphasis added). In 1998, Johnson was charged, in a multi-count indictment, with three counts of selling cocaine. The sales occurred on January 28,1997; February 6, 1997; and March 4, 1997. Johnson pleaded guilty to the first two counts. The State dismissed the third count as part of its plea agreement with Johnson. Since he was charged in a multi-count indictment, Johnson argues that those crimes cannot be used to adjudicate him as a habitual offender, because the requirements of section 99-19-81 are not satisfied.
¶ 33. In Kolb v. State, 568 So.2d 288 (Miss.1990), our supreme court examined the effect that a multi-count indictment has on an offender’s status under section 99-19-81. The defendant in Kolb was convicted in the State of Nebraska of two burglary charges. Kolb, 568 So.2d at 288-89. The Nebraska charges were presented against the defendant in a multi-count indictment. Id. The defendant argued that the charges could not satisfy the requirements of Mississippi’s section 99-19-81. Kolb, 568 So.2d at 288-89. The court stated that
the mere form of presenting two charges as separate counts of a single information (or indictment) in no way merges those charges except for the limited purpose of judicial economy and procedure. The prosecution is still required to prove each and every element of each charge the same as if each had been proceeded upon in a separate trial. For aught that appears, charges such as this[,] which arise out of wholly separate occurrences at different times and places, quite likely would have been severed for trial had [the defendant] not entered pleas of guilty. Separation of these charges into separate counts rendered them sufficiently separate to satisfy [s]ection 99-19-81’s mandate that they be “separately brought.”
Kolb, 568 So.2d at 289.
¶ 34. The charges in Johnson’s indictment were separated into separate and distinct counts; the sales clearly occurred at different times; and Johnson served ten years for each crime. As such, Johnson’s previous crimes, even though listed in a single indictment, were properly considered as separate crimes for purposes of habitual-offender sentencing. This issue is without merit.

V Firearm Enhancement

¶ 35. Johnson alleges that the circuit court erred by failing to submit for the jury’s consideration the elements that would justify the enhancement of his sentence. We first note that Johnson’s challenge on appeal to this portion of his sentence is different from the challenge that he made to his sentence in the circuit court. Prior to sentencing, Johnson argued that the firearm enhancement did not apply because his only conviction was the felon-in-possession charge. As stated, on appeal, Johnson argues that the enhancement portion of his sentence is illegal because the jury was not allowed to consider the elements that would justify enhancement of his sentence.
¶ 36. It is a well-settled principle of law that “an objection on one or more specific grounds constitutes a waiver of all other grounds.” Spicer v. State, 921 So.2d 292, 316 (¶ 49) (Miss.2006) (citation omitted) *627 (modified by Brown v. State, 986 So.2d 270, 286 (¶ 16) (Miss.2008), and partially abrogated by O’Connor v. State, 120 So.3d 390, 399-401 (¶¶ 23-29) (Miss.2013)). Because Johnson objects to his sentence enhancement on a ground not raised in the circuit court, he “must rely on plain error to raise the issue on appeal[;] ... otherwise it is procedurally barred.” Parker v. State, 30 So.3d 1222, 1227 (¶ 14) (Miss.2010) (citing Walker v. State, 913 So.2d 198, 216 (¶ 45) (Miss.2005)). Our supreme court has “held that defendants have a fundamental, constitutional right to be free from illegal sentences, and plain error exists when an error affects a defendant’s substantive or fundamental right.” Harris v. State, 99 So.3d 169, 172 (¶ 15) (Miss.2012) (internal citations omitted). Therefore, we will address Johnson’s sentence-enhancement argument. In doing so, we first note that the State has conceded that it was error to enhance Johnson’s sentence pursuant to the firearm-enhancement statute without first presenting the enhancement elements to the jury.
¶ 37. According to Mississippi Code Annotated section 97-37-5(1), (2) (Supp. 2013), it is a felony for a convicted felon to possess a firearm. The jury convicted Johnson of this crime. Mississippi Code Annotated section 97-37-37(2) (Supp.2013) provides:
Except to the extent that a greater minimum sentence is otherwise provided by any other provision of law, any convicted felon who uses or displays a firearm during the commission of any felony shall, in addition to the punishment provided for such felony, be sentenced to an additional term of imprisonment ... of ten (10) years[.]
(Emphasis added).
¶ 38. The circuit court sentenced Johnson to an additional ten years in prison pursuant to the firearm-enhancement statute. In Brown v. State, 995 So.2d 698, 703 (¶ 20) (Miss.2008) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)), our supreme court held that “other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” It cannot be denied that one can possess a firearm without using or displaying it. Although there is evidence that Johnson used and displayed a firearm, he was not convicted of any charge involving the use and display of the firearm. Before the court could enhance Johnson’s sentence above the ten-year statutory maximum for possession of the firearm by a convicted felon, the jury was required to determine if Johnson had used or displayed the firearm that he possessed in the commission of a felony. As the jury was not instructed to make that determination, the circuit court erroneously used a fact that had not been determined by the jury to enhance Johnson’s sentence beyond the statutory maximum. Accordingly, the enhancement portion of Johnson’s sentence is reversed and rendered.
¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF POSSESSION OF A FIREARM BY A CONVICTED FELON, AND SENTENCE, AS A HABITUAL OFFENDER, OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, IS AFFIRMED. THE SENTENCE OF TEN YEARS AS AN ENHANCEMENT FOR THE USE OF A FIREARM IN THE COMMISSION OF A FELONY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO HINDS *628 COUNTY AND ONE-HALF TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. BARNES AND JAMES, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY ISHEE, J.

. The record does not inform us as to Michelle’s last name.